53 P.3d 240

**Mei Li TELLER, Plaintiff–Appellee,**

v.

**Howard Scott TELLER, Jr., Defendant–Appellant.**

No. 22440.

Supreme Court of Hawai'i.

Aug. 30, 2002.

Reconsideration Denied Sept. 19, 2002.

the grounds set forth in HRS § 702–236(1)(b), I do not consider the arguments of the parties with respect to HRS § 702–236(1)(c).

Peter Van Name Esser and Michael J.Y. Wong, Honolulu, for defendant-appellant.

Thomas L. Stirling, Jr. and Renee M. Yoshimura of Stirling and Kleintop, Honolulu, for plaintiff-appellee.

MOON, C.J., NAKAYAMA, RAMIL, and ACOBA, JJ. and Circuit Judge BLONDIN, in Place of LEVINSON, J., Recused.

Opinion of the Court by NAKAYAMA, J.

Defendant–Appellant Howard Teller ("Howard")[1] appeals from the post-decree orders of the family court of the first circuit, the Honorable Dan T. Kochi presiding, recalculating the amount of the marital estate and denying prejudgment interest. On appeal, Howard argues that the family court erred in: (1) rejecting the Sullivan/Scott appraisal of his pre-marital intellectual property; (2) finding that his pre-marital intellectual property did not depreciate; (3) finding that $1,058,945 of the approximately $3 million earned in the sale of his business was equally divided between pre-marital intellectual property and post-marital property; (4) ruling that payments from the sale of the "latching detector" patent constituted marital income; and (5) ruling that prejudgment interest pursuant to Hawai'i Revised Statutes (HRS) § 636–16 (1993) may not be awarded in family court cases. As an initial matter, we note that Howard submitted a brief that is nonconforming with the Hawai'i Rules of Appellate Procedure (HRAP) Rule 28 requirement that the opening brief contain a concise statement of the points upon which the party alleges as error, properly identify where in the record the alleged errors can be found, and the specific finding of fact or conclusion of law that is being contested. In this case, we reach the merits of four of Howard's points of error because, despite the nonconformity, the record and the opening brief sufficiently established the merits. Inasmuch as Howard's brief falls woefully short of compliance with HRAP Rule 28 in regard

1. The first names of the parties will be used for purposes of clarity. No disrespect is intended.

to the issue of prejudgment interest, we decline to address this point. We affirm the judgment of the family court in all respects.

## I. BACKGROUND

### A. Procedural History

On April 2, 1976, Howard and Plaintiff–Appellee Mei Li Teller (Mei Li) were married.[2] Mei Li filed for a divorce on November 20, 1992. The couple had two children.[3] On December 12, 1994, Howard filed a cross-complaint for divorce. There was no premarital agreement and by the time the couple divorced the estate was substantial. On February 2, 1995, the family court entered its Findings of Facts (FOFs) and Conclusions of Law (COLs). Howard filed a Notice of Appeal on February 8, 1995. The Intermediate Court of Appeals (ICA) reversed the family court's ruling that trade secrets were "goodwill," but otherwise affirmed the property division order. Howard applied for a writ of certiorari arguing that the ICA erred in affirming the family court's valuation of his pre-marital trade secrets. We granted certiorari and affirmed that part of the ICA opinion holding that trade secrets were not a type of personal goodwill and reversed the ICA's holding that the property division was otherwise valid. On July 24, 1998, this court remanded the case to the family court for recalculation of the amount of the marital estate. On March 3, 1999, the family court, the Honorable Dan T. Kochi presiding, filed its FOFs and COLs.[4] Howard timely appealed.

### B. Factual Background

Prior to and after his marriage to Mei Li, Howard was engaged in the business of inventing and promoting electronic products.[5] On January 13, 1971, Howard incorporated Modular Radio Corporation (MRC). MRC was in the business of "designing, fabricating, promoting, marketing, and selling electronic components." Howard designed a "wall barometer with a built-in weather radio system which could be activated ... to provide local weather" information. While working on this project, Howard began designing a circuitry system that would improve the quality of reception in his product [hereinafter "weather radio"]. On April 28, 1975, Howard incorporated Radioresearch Corporation (RRC).

Howard's next invention requires a modicum of historical knowledge. The United States Department of Commerce initiated a weather system in 1953, the purpose of which was to "establish a wide-based emergency warning network for the general public." Commercializing this idea through the use of weather radios was hampered because the only product available was of relatively low quality. Howard devised a better quality weather radio that included a "weather alert," a feature that alerted the owner of the radio to turn the radio on to receive important weather information [hereinafter "weather alert"]. Radio Shack was interested in purchasing Howard's product, however, production of Howard's radios was based in Asia, which conflicted with Radio Shack's policy not to purchase products manufactured in the far east from an American agent.[6] To resolve this conflict Howard formed a trading company, Nimbus (Hong Kong) Limited on February 15, 1977, whose parent company was MRC. In order to de-

---

2. The original divorce complaint was filed on November 20, 1992. Procedurally, this case has been appealed to this court, remanded, and has returned to this court on basically the same property division issues. The general facts regarding the divorce and property settlement will be limited, while the facts directly related to this appeal will be reviewed in full.

3. All issues of custody and child support have been resolved.

4. The 1999 family court decision is discussed in section I.D., *infra*.

5. Facts have been obtained from a Tax Court Opinion, *Teller & Teller v. Commissioner*, T.C. Memo 1992–402, 1992 WL 163688, in which both Howard and Mei Li stipulated to the facts as accurate for the purpose of assisting in the understanding of the assets and property division in the divorce case. The *Teller* tax opinion is very thorough in its recitation of the historical development of the weather alert systems as well as the evolution of Howard's business interests.

6. This policy appears to be based in part to maintain situs control over the manufacturing of their products.

crease manufacturing costs, Mei Li, through her family set up a plant in Taiwan to manufacture weather radios.[7]

Howard obtained two patents from his weather radio invention. The "latching detector" patent (Circuit Patent) was the device that alerted the owner of the radio to activate the radio. The Tuner Patent permitted the "reception of three weather radio frequencies using only one, rather than three, crystal [sic] and it improved the rejection of unwanted signals in weather radios[.]" The Circuit Patent was issued on June 12, 1979, while the Tuner Patent was issued on November 30, 1980. Howard testified that he invented the device that made up the Circuit Patent approximately three months prior to his marriage to Mei Li.

In 1981, Howard listed MRC for sale.[8] During this process, Howard made an agreement to assign the rights of the Circuit Patent to Paignton Ltd. (Paignton) for $100,000 every month for 49 months. On April 20, 1982, four days after the assignment of the Circuit Patent, Paignton "agreed to transfer rights to the Circuit Patent under a nonexclusive license to Nimbus Ltd. in exchange" for close to $5 million dollars, to be paid in installments of $311,000 every three months. Paignton was formed three weeks prior to the assignment of rights and had $2.00 in capital at the time the assignment was made.

On December 28, 1983, Howard executed a Buy–Sell Agreement with Zinta Trading Ltd. (Zinta Agreement) which provided in part:

[The transfer of] all of the issued and outstanding shares of MRC and RRC[.]

. . . .

Until the time of closing, [Howard] shall continue to operate each corporation to minimize the disruption associated with turning over the operation of the underlying business; and for a convenient time thereafter shall assist Buyer in taking control of the operation[.]

. . . .

At closing [Howard] shall deliver or cause to be delivered to Buyer, and Buyer shall receipt therefore:

. . . .

assignment of [Howard] to any future payments under Agreement, dated 16 August 1982, between [Howard] and Paignton Limited[.]

[Howard] shall agree to co-represent the Buyer, for a period of two years from the date of this Agreement, at up to three meetings per year, with Radio Shack in the United States, at Buyer's cost for First Class air travel plus accommodations for [Howard] and his family between Honolulu, Hawaii, Hong Kong, the place of meeting, and return.

[Howard] shall also agree to give to Buyer a right of first refusal, at a compensation to be agreed upon by [Howard] and Buyer on a product-by-product basis, on all new products of [Howard].

On January 13, 1988, the Circuit Patent and the Tuner Patent "were assigned to two Liberian companies nunc pro tunc as of December 29, 1983. These assignments were recorded with the Patent and Trademark Office on February 1, 1988. The preamble to the assignments of the patents recited that [Howard] was the owner of the entire right, title and interest in the Circuit Patent." In its findings pertinent to this appeal, the family court found that: (1) the parties stipulated to the findings of fact in the tax case; (2) Howard introduced no credible evidence of the value of his intellectual property; (3) Howard's intellectual property prior to marriage was dependant upon Howard's further ingenious ideas and effort during the marriage; (4) the intellectual property constituted personal goodwill; (5) Howard's net worth at time of marriage was $250,000; and (6) after reserving Howard's pre-marital net value, the remaining assets were allocated equally between the parties. The ICA held

---

7. This decreased costs because Howard, as an American citizen, was taxed at a higher rate for doing business in Taiwan.

8. Howard began suffering from a "stress-induced hypertension" in the late 1970s. He was informed that unless he reduced his stress his risk of experiencing a life-threatening event would increase. Howard then began searching for a buyer for all of his companies.

that trade secrets were not personal goodwill, but affirmed the property division.

## C. The Supreme Court Memorandum Opinion

Howard applied for a writ of certiorari. We granted certiorari because of an apparent inconsistency in the ICA memorandum opinion. The ICA held that the family court erred when it ruled that Howard's "various ingenious concepts, techniques, technologies and ideas prior to marriage" amounted to personal goodwill. After determining that Howard's trade secrets were not personal goodwill, the ICA affirmed the family court's award of approximately $250,000 to Howard, based upon the value of MRC prior to marriage. We affirmed in part and reversed in part, holding that trade secrets were not personal goodwill, and that there was "insufficient basis for upholding the property division." [9]

## D. The Family Court Opinion on Remand

On remand, the family court issued its FOF's and COLs on March 19, 1999. It found, *inter alia*, that the payments from Paignton to Howard constituted marital assets, in part, because the transaction appeared to be illusory. Finding of Fact number 6 provided:

The court agrees with the Tax Court that the Defendant–Paignton–MRC transactions appear to be illusory. Paignton served no other purpose other than to collect $311,000 from MRC every three months and distribute $100,000 to Defendant monthly. Furthermore, Paignton dissolved itself less than three weeks after Defendant sold all of his interest in MRC to Zinta Trading Ltd. (Zinta) on December 28, 1983. Paignton served no other purpose than [sic] act as a conduit to funnel accumulated cash from MRC to Defendant. *Monies held by MRC were none other than marital assets gained through the sale of radios produced and sold during the marriage. Therefore, the court finds all payments Defendant received from Paignton were marital assets.*

The family court did not find Dr. Sullivan's report to be credible. This was so, because Dr. Sullivan calculated the valuation based on the "cost method." Finding of Fact number 8 and 9 provided:

If Sullivan's theory was applicable, Defendant's radio developed in 1976 would have had a comparable or better radio in 1983. However, that was not the situation in this case. In fact, in 1994, almost twenty years later there was still no comparable radio in the market which competed with Defendant's radio. Defendant claimed that others were not able to develop a comparable radio because of his trade secrets. Consequently, Sullivan's productivity factor is inapplicable and the court disregards his opinion.

Defendant additionally claims his premarital intellectual assets were worth $1,500,000, based upon Harold Scott's estimated 1976 development costs for the radio. There was no evidence as to the amount a buyer would have paid for Defendant's radio on the date of marriage in 1976. No profits were realized from the total of 50,000 weather radios and 2,000 weather-alert radios sold in all of 1976. Extrapolating from the total number of radios sold, there were only 12,500 weather radios and 500 weather-alert radios sold on the date of marriage in April 1976. On the date of marriage, would someone have paid $1,500,000 for the radio in an untested market? Defendant was able to profit from the radio because he was able to

---

9. We explained that the tax court opinion did not include a valuation of Howard's intangible assets, inasmuch as those assets were not the property of MRC. The effect of the ICA's decision was that Howard received nothing for his trade secrets. We did not comment on the credibility of Howard's valuation expert, Dr. Sullivan, however, we noted that the family court had made no findings on that point. On remand, we instructed the family court to review the record to determine the value of Howard's intellectual property. This task could be accomplished through a close reading of the record, including, but not limited to the tax court opinion, and if found credible, Dr. Sullivan's report. Implicit throughout our memorandum opinion was the acceptance of intellectual property as a kind of property subject to equitable distribution pursuant to our divorce statutes.

produce them at a low cost in Taiwan with the assistance of his wife and her family. Would someone who purchased his idea have been able to produce the radio at the same low cost? The court is not convinced the development cost equates to the market value for the radio on the date of the marriage. The court disregards Scott's [10] opinion.

The family court then determined that the proper value for the intellectual property, *i.e.,* the weather radio and weather alert, would be the amount one would pay for the property.

> [T]he value of Defendant's intellectual assets is the amount one would pay for them. The Tax Court concluded MRC and RRC had a combined stock value of $1,950,000 at the time of the sale to Zinta with the remaining value attributable to various patents and rights Defendant had at the time of the sale.

Finally, the family court determined that the combined value of Howard's pre-marital and marital intangible property including, but not limited to intellectual property was $1,000,000.[11]

> The court finds the $1,000,000 includes the value of Defendant's assistance in the smooth transfer of control to Zinta, his co-representation at Radio Shack meetings for a period of two years, assignment of any future Paignton payments, right of first refusal on all new products of Defendant, patents for ideas conceived after marriage, patents for ideas conceived prior to marriage, pre-marital trade secrets and any other pre-marital intellectual assets.

10. Dr. Sullivan's report referenced Harold Scott, the Chief of Public Weather Services for the U.S. National Weather Service. Scott's organization was in the midst of developing an appropriation request to Congress for funds to develop a weather radio when Howard developed his. Scott informed Dr. Sullivan that NWS had anticipated a development cost of $1,500,000.

11. The tax court opinion discussed the Teller's property rights in the trade secrets and patents. Because the parties stipulated to the facts as set forth in that case, trade secrets and patents are dealt with separately. Generally, the holder of a property right in intellectual property would obtain either trade secret protection or patent pro-

The family court found that $500,000 of the $1,000,000 qualified as pre-marital assets. It then ordered Mei Li to return to Howard $250,000 of her original property award. The family court, contrary to Howard's argument in his opening brief, did not make any FOFs or COLs regarding the issue whether prejudgment interest applies or whether HRS § 636-16 authorizes the family court to award prejudgment interest. On July 9, 1999, the family court denied Howard's motion for prejudgment interest and attorneys fees.[12] Howard timely appealed.

## II. STANDARDS OF REVIEW

### A. Family Court Findings of Fact

The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. *[In re] Doe,* 84 Hawai'i [41,][ ] 46, 928 P.2d [883,] [ ] 888 (citing *State v. Naeole,* 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). " 'Substantial evidence' . . . is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Doe,* 84 Hawai'i at 46, 928 P.2d at 888 (quoting *State v. Wallace,* 80 Hawai'i 382, 391-92, 910 P.2d 695, 704-05 (1996)); *see also State v. Kotis,* 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999).

tection. In this case, Howard argues that all of the property qualifies as property arising from the trade secret protection, property he owned pre-maritally. The intellectual property sold during the marriage was protected by patents, not trade secrets. Inasmuch as the classification of property substantially determines whether distribution was equitable, both types of property are addressed in full.

12. The order was silent as to whether HRS § 636-16 was applicable to prejudgment interest in a divorce decree. Howard's attorney signed the judgment approving of both the form and the content of the order.

*In re Doe,* 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001).

### B. Conclusions of Law

 We review the trial court's [conclusions of law] de novo under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*State v. Medeiros,* 89 Hawai'i 361, 364, 973 P.2d 736, 739 (1999) (quoting *[State v.] Kane,* 87 Hawai'i 71, [ ] 74, 951 P.2d [934,] [ ] 937 [(1988)] (quoting *Aickin v. Ocean View Inv. Co.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997))) (ellipsis points in original).

*Chun v. Board of the Employees Retirement Sys.,* 92 Hawai'i 432, 438–39, 992 P.2d 127, 133–34 (2000).

### C. Property Division

 There is no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in HRS § 580–47. [13] We have said that the discretionary power of a trial court in dividing and distributing property in a matrimonial action under HRS § 580–47 will not be disturbed in the absence of a showing of abuse. *Farias v. Farias,* 58 Haw. 227, 566 P.2d 1104 (1977); *Frandsen v. Frandsen,* 58 Haw. 98, 564 P.2d 1274 (1977); *Carson v. Carson,* 50 Haw. 182, 436 P.2d 7 (1967); *Fowler v. Fowler,* 49 Haw. 576, 424 P.2d 671 (1967); *Crow v. Crow,* 49 Haw. 258, 414 P.2d 82 (1966). Further, the division and distribution of property pursuant to a divorce need

not be equal but should be just and equitable.

*Au–Hoy v. Au–Hoy,* 60 Haw. 354, 357, 590 P.2d 80, 83 (1979).

## III. DISCUSSION

### A. Intellectual property is subject to equitable distribution pursuant to HRS § 580–47.

 We first determine the propriety of deeming intellectual property as marital assets subject to division upon divorce. This issue has never been addressed by this court. Few jurisdictions have been presented with this issue. The Kansas Supreme Court had the occasion to decide whether equitable division of intellectual property rights was appropriate. Kansas, like Hawai'i, is an equitable distribution state. In *In re Monslow,* 259 Kan. 412, 912 P.2d 735, 745 (1996), the court quoted a treatise on the valuation and distribution of marital property, in which the author advised that intellectual property should be considered an asset susceptible to property division. The author stated:

> '[I]ntellectual property, once it has been created, is less inextricably related to its creator than other assets now characterized as marital property, such as pensions and professional goodwill. Unlike pensions and professional goodwill, rights in intellectual property are highly transferable, and title may thereafter be placed in the name of one who did not originally produce them.'

*Monslow,* 912 P.2d at 745 (quoting 2 Rutkin, *Valuation and Distribution of Marital Property* § 23.07[1], at 23–133 (1995)). In *Monslow,* Vincent, the ex-husband, held an interest in two patents. He characterized the interests as merely expectancies without "ascertainable value and suggested that they should be set aside" for himself. *Monslow,* 912 P.2d at 737. In the alternative, Vincent argued that, should the court consider these interests as property, his ex-wife Linda, should be given only a percentage of gross proceeds up to a specific dollar limit. *Id.*

---

**13.** HRS § 580–47 (1993) sets forth Hawaii's equitable distribution legislation.

The basis of this argument rested on Vincent's contention that, at the time of divorce, his interests had no ascertainable value, and therefore, could not be divided. The supreme court rejected this argument, affirmed the court of appeals, and concluded that the interests were property capable of division. The court added that because there was no current value available, it was proper for the trial court to divide the property so that Linda received a percentage of all future profits.

The *Monslow* court distinguished the facts of its case from those cases in which a patent (or copyright) was found not to be property for purposes of division in divorce. *Id.* at 745 (quoting *Woodward v. Woodward*, 294 S.C. 210, 363 S.E.2d 413 (Ct.App.1987) (holding that because husband did not complain of wife's interest in patent at trial he was barred from doing so on appeal); *In re Marriage of Sadecki*, 250 Kan. 5, 825 P.2d 108 (1992) (holding that the trial court's assignment of undivided retirement benefits to the husband was not an abuse of discretion, because there was no record of present value)). In *Monslow*, unlike the cases cited above, the issue was properly before the court, and despite the lack of current value, the interest could be divided in the event the value became ascertainable.

Like the facts in *Monslow*, the issue whether intellectual property can be divided is properly before this court. Moreover, both parties implicitly agree that the intellectual property is divisible because the value is ascertainable and they both claim interests in the property. We agree with and adopt the reasoning of the *Monslow* court and hold that intellectual property is capable of division for purposes of equitable distribution.

### 1. In a dissolution action, trade secrets are subject to equitable distribution pursuant to HRS § 580–47.

Having determined that intellectual property is capable of equitable distribution, we now turn our attention to trade secrets, a subset of intellectual property. A trade secret is defined in HRS § 482B–2 (1993) the Uniform Trade Secret Act (UTSA):

"Trade secret" means information, including a formula, pattern, compilation, program device, method, technique, or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Our case law has only addressed trade secrets in the context of protective orders related to discovery disputes. We have not analyzed the issue whether a trade secret is property and, if so, whether it is tangible or intangible property. The United States Supreme Court in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), relies on the Restatement of Torts § 757 (1939),[14] definition and states "[b]ecause of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others." *Ruckelshaus*, 467 U.S. at 1002, 104 S.Ct. 2862. The *Ruckelshaus* Court recognized without discussion that trade secrets are intangible, but property nonetheless. This is so, according to *Ruckelshaus* because trade secrets carry with them the hallmarks of property. Trade secrets are assignable,[15] can form the res of a trust,[16]

**14.** The Court in *Ruckelshaus* stated that "[t]he Restatement defines a trade secret as 'any formula; pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' " *Ruckelshaus*, 467 U.S. at 1001, 104 S.Ct. 2862 (quoting Restatement of Torts § 757 cmt b).

**15.** See *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 401–402, 31 S.Ct. 376, 55 L.Ed. 502, (1911) in which the Court stated that "[t]he secret process may be the subject of confidential communication and of sale or license to use with restrictions as to territory and prices." *Id.* at 402, 31 S.Ct. 376; *see also Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 225 (2d Cir.1971).

**16.** *Ruckelshaus*, 467 U.S. at 1002, 104 S.Ct. 2862 (quoting Restatement (Second) of Torts § 82 cmt. e (1959); 1 A. Scott, *Law of Trusts* § 82.5 at 703 (3d ed.1967)).

and pass to a trustee in bankruptcy.[17] Although, the *Ruckelshaus* Court recognized that they had never directly addressed whether trade secrets were property rights for purposes of a fifth amendment takings claim, the Court stated that "intangible property rights protected by state law are deserving of the protection of the Taking Clause." *Id.* at 1003, 104 S.Ct. 2862.

This is not inconsistent with the position taken by this court in matters of intangible property. In the context of pensions and retirement benefits, this court has held that

> these benefits were required to be taken into consideration by the family court judge in 'dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate,' in accordance with the mandate of HRS § 580–47, if such benefits comprised a portion of 'the estate of the parties.'

*Tavares v. Tavares*, 58 Haw. 541, 544, 574 P.2d 125, 127 (1978) (quoting HRS § 580–47). In *Tavares*, without notice to the wife, the family court held a hearing on the divorce complaint filed by the husband. "A decree of divorce, in which plaintiff was awarded the family residence, subject to the mortgage," was subsequently issued. *Tavares*, 58 Haw. at 541–42, 574 P.2d at 126. The wife moved to have the divorce decree modified to award to her a share of the marital estate including pension and retirement benefits. The family court refused to address the issue of the husband's pension and retirement benefits because the wife had failed to either properly appeal the decision of the family court or file a motion for reconsideration. This court, after addressing the procedural issues unrelated to intellectual property, concluded that the wife was entitled to review of the marital estate, including the pension and retirement benefits. *Id.* at 542, 574 P.2d at 126.

■ In *Linson v. Linson*, 1 Haw.App. 272, 278, 618 P.2d 748, 751 (1980), the ICA held "that the phrase 'estate of the parties' as it is used in HRS § 580–47 means anything of present or prospective value, and therefore that a spouse's nonvested military retirement benefit constitutes part of the estate of the parties under HRS § 580–47." *Linson*, 1 Haw.App. at 278, 618 P.2d at 748; *see also Antolik v. Harvey*, 7 Haw.App. 313, 317, 761 P.2d 305, 308 (1988) (adopting the view that "[g]oodwill is an attribute of a business."). *Id.* at 317, 761 P.2d at 308. "An 'income-producing entity, regardless of the nature of the business organization, may have an asset of recognized value beyond the tangible assets of such entity, an intangible asset generally characterized as goodwill.' " *Id.* (quoting *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851, 857 (1986)). "[G]oodwill is a marketable and transferable asset." *Id.* (quoting *Prahinski v. Prahinski*, 75 Md.App. 113, 540 A.2d 833, 841 (1988)). These cases establish that intangible property is subject to equitable distribution.

■ A trade secret, although intangible, is a presently existing property right because there is a right to bring a cause of action for misappropriation of the property. *See Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 245–46 (Ind.App.2001) ("[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of proving that they exist."); *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 95 (Ind.Ct.App.2001); *DVD Copy Control Assoc. v. Bunner*, 93 Cal.App.4th 648, 659, 113 Cal.Rptr.2d 338 (2001) (stating the UTSA was implemented to protect economically valuable trade secrets from misappropriation); *The Pullman Grp., LLC. v. Prudential Ins. Co. of Am.*, 288 A.D.2d 2, 733 N.Y.S.2d 1, 2 (2001) (ruling that an intent to assign trade secrets not imputed absent express, volitional conduct). Our own HRS § 482B protects trade secrets though injunctive relief, *see* HRS § 482B–3 (1993),[18] and

---

17. *Id.* (quoting *In re Uniservices, Inc.*, 517 F.2d 492, 496–97 (7th Cir.1975)).

18. HRS § 482B–3(a) provides in relevant part:
Actual or threatened misappropriation may be enjoined. Upon application to a circuit court of the State, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

damages, *see* HRS § 482B–4 (1993),[19] in the event that there is actual or threatened misappropriation or material and prejudicial change of position as a result of misappropriation. Finally, HRS § 482B–6 (1993)[20] provides for the preservation of secrecy for trade secrets. Although trade secrets are indeed intangible property, they are presently existing property with value. As such, we conclude that trade secrets may be subject to equitable division pursuant to HRS § 580–47, depending upon when the right to the trade secret vested.

Both parties in the case *sub judice* agree that a trade secret in Howard's inventions existed pre-maritally. Howard testified that the weather radio was his invention and that there were no similar inventions in the marketplace. The weather alert invention, according to Howard's testimony, was completed approximately three months before marriage. Mei Li does not dispute this. Thus, it is uncontested that these inventions constituted pre-marital property. Although, in this instance, it is clear that the right in the trade secret vested prior to marriage, this may not always be the case. Because this case turns on when property rights vested, we will briefly explore when property rights in trade secrets vest.

### 2. Rights in trade secrets vest when the information has either actual or potential economic value.

■ Determining when an idea becomes a trade secret with present or future value requires an inquiry into when the right in the trade secret "vests" or "accrues." This court has defined the term "accrued" as "[t]o come into existence as an enforceable claim; to vest as a right; as, a cause of action has accrued when the right to sue has become vested." *Akana v. Damon,* 42 Haw. 415, 415 (Hawai'i Terr.1958). Black's Law Dictionary

echoes this definition, providing that "accrues mean[s] to arise," "to come into force or existence, to vest." *Black's Law Dictionary* at 14 (6th ed.1991). In discussing ownership interests in trade secrets, the Court of Appeals of the Fourth Circuit stated "one 'owns' a trade secret when one knows of it, as long as it remains a secret." *DTM Research, LLC v. AT & T Corp.,* 245 F.3d 327, 332 (4th Cir.2001). A trade secret, then, must "accrue" to become a property right for purposes of Hawai'i equitable distribution law. This is an intensely fact-driven analysis because the moment at which an idea blossoms into a property right protected by statute will, in large part, be dependent upon the content of the secret.

■ In this case, Howard testified that the weather radios containing his invention were manufactured and marketed prior to marriage. It appears from his testimony that he sold approximately 75,000 radios prior to marriage. The weather alert, however, had not been marketed, but a successful and functional prototype had been completed three months prior to the marriage. Thus, Howard's property rights in the trade secrets vested prior to marriage.

### 3. In a dissolution action, patents are subject to equitable distribution pursuant to HRS § 580–47.

■ Patents are "a bundle of legal rights granted to an inventor by federal law." Brett R. Turner, *Division of Intellectual Property Interests Upon Divorce,* 12 No. 2 Divorce Litig. 17 (2000). Patent rights give the right to exclusive use for a finite period of time to the patent holder. *Id.* The United States Constitution provides for protection of patents under article 1, § 8, clause 8. In particular, patents are afforded protection under Title 35 of the United States Code. *See generally,* 35 U.S.C. 101 et seq. (1994). The

19. HRS § 482B–4 provides in relevant part:

Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation.

20. HRS § 482B–6 provides:

In an action under this chapter, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

statute provides "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.[21] Very few state courts have completed an in depth analysis of patents as property rights susceptible to division in a marital dissolution.[22]

One issue that has arisen in most of the cases that have accepted patents as marital property is whether the patent is pre-marital, separate, or marital property. The determination of when the patent vests, like trade secrets, becomes critical to a court's ability to equitably divide property. Under federal statute, the right in a patent accrues at the time the patent is issued. In *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed.Cir.1996), the court stated that "a patent does not exist until it is granted." Under this rationale, the intellectual property for which a patent is issued is not protected unless and until the patent issues.

Our courts have consistently held that property owned prior to marriage is separate, while the appreciation value of this property is part of the marital estate.[23] That is not to say that the value of the appreciation is presumptively divided, rather, the family court has the discretion to divide this property equitably. In a situation such as the case at hand, the invention was completed prior to marriage and the patent was issued after marriage. Generally, it will be incumbent upon the family court's discretion to determine whether there was value in the pre-patent intangible intellectual property and the patent itself. This will necessarily be a fact-driven inquiry.

## B. The family court's rejection of the Sullivan report was not an abuse of discretion.

■ For purposes of this opinion, we limit our discussion to the cost approach and the fair market value approach. Howard argues that the family court

> rejected the $1.5 million Sullivan/Scott appraisal because 1) Howard's radio company was not profitable at DOM, 2) no one would "have paid $1.5 million in an untested market," 3) Howard later profited from his design "because he was able to produce them at low cost in Taiwan," 4) "there was no evidence as to the amount a buyer would have paid in 1976," and 5) "court is not convinced that the development cost equates with the market value."

Howard also argues that the family court demonstrated a "fundamental misunderstanding of the Sullivan/Scott appraisal." This is so, Howard argues, because the Sulli-

---

**21.** Because the United States Supreme Court has determined that Federal case law does not preempt the states' right to impose regulation on patents, we do not address federal preemption. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 479, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) ("The only limitation on the States is that in regulating the area of patents and copyrights they do not conflict with the operation of the laws in this area passed by Congress[.]"); *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 266, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979) (defining factors to determine if state law conflicts with the federal patent law); *Rodrique v. Rodrique*, 218 F.3d 432, 439 (differentiating between total preemption, such as ERISA, from limited preemptive scope of copyright law).

**22.** For cases either expressly or implicitly recognizing patents and other intellectual property subject to division in a marital dissolution action see *Rose v. Rose*, 395 So.2d 1038, 1040 (Ala.Civ. App.1981) (affirming trial court's equitable distribution of royalties); *Lorraine v. Lorraine*, 8 Cal. App.2d 687, 48 P.2d 48, 55 (1935) (holding patents applied for after marriage are community

property); *Gallo v. Gallo*, 184 Conn. 36, 440 A.2d 782 (1981) (affirming award to wife of 20% of royalties); *In re Marriage of Aud*, 142 Ill. App.3d 320, 96 Ill.Dec. 615, 491 N.E.2d 894, 899 (1986) (affirming trial court's determination of value of inventions); *Howes v. Howes*, 436 So.2d 689, 692 (La.Ct.App.1983) (reversing trial court and holding wife had undivided interest in husband's patented inventions); *In re Downes*, 177 Cal.App.3d 205, 222 Cal.Rptr. 776 (1986) (recognizing patents as community property when dividing marital estate); and *Dunn v. Dunn*, 802 P.2d 1314, 1319 (Utah Ct.App.1990) (recognizing that royalties from patent are divisible).

**23.** *See Tougas v. Tougas*, 76 Hawai'i 19, 27, 868 P.2d 437, 445 (1994) (reaffirming five categories of net market values employed in dividing marital and nonmarital assets); *Gussin v. Gussin*, 73 Haw. 470, 480, 836 P.2d 484, 489 (1992) (emphasizing that the family court should not be bound by rules that presume an even split of appreciation of pre-marital property).

van report was "not based on market value, radio income, offers from competitors, or the location of Howard's manufacturing plant." Instead, the appraisal was founded upon "the cost approach." This approach "measures the value of a technology by quantifying the amount of money required to reproduce either a duplicate or the functional equivalent of the subject intellectual asset." Although Howard identifies five allegedly erroneous points made by the family court on this issue, he only argues that there was evidence of value and that the cost approach was the appropriate method through which to value Howard's intellectual assets.[24]

Mei Li argues that inasmuch as this is a divorce case, the proper standard to determine value of assets is net market value (NMV) (hereinafter "fair market value"), not the cost to develop or duplicate the asset. Even if this court were to accept the cost approach, argues Mei Li, the report itself was based upon speculative information, thus its probative value was questionable. The only issue then, appears to be whether the family court properly rejected the cost approach advocated by Howard and as detailed in the Sullivan/Scott Appraisal.

Theories of valuation of intellectual property must take into account the "highest and best usage in light of the most reasonable and legal use of the intellectual property, that is physically possible, appropriately supported, and financially feasible, [and] that results in the highest value." Lee G. Meyer, et al, *Intellectual Property in Today's Financing Market*, 19–MAR Am. Bankr.Inst. J. 20, 20 (2000). Of the three methodologies for valuing intellectual property: (1) the cost approach; (2) the market approach; and (3) the income approach, *id.*, we address the cost approach and the market approach.

### 1. The family court did not abuse its discretion when it disregarded the cost approach advocated by Howard.

The cost approach, advocated by Howard, "measures the cost to replace (the replacement cost) the item of intellectual property." Goldscheider & Epstein, *Determining the Value of Technology and Setting Royalty Rates*, 4 NO. 10 J. Proprietary Rts. 9, 9 (1992). Goldscheider and Epstein explain that this methodology stems from the basic assumption that "the cost to acquire, or newly develop, a given item of property is equivalent to the value the property will render during its economic life." *Id.* Many courts consider the cost approach for valuing real property in marital dissolution situations.[25] This approach has not been found to be the best approach when actual values of property are available. For example, a North Carolina appellate court has addressed the cost approach in the context of determining tax liability on real property. That court noted that "[t]he cost approach is better suited for valuing specialty property or newly developed property; when applied to other property, the cost approach receives more criticism than praise." *In re The Greens of Pine Glen Ltd.*, 147 N.C.App. 221, 555 S.E.2d 612, 615 (2001). The *Pine Glen* court concluded that in the event that no other methodologies will "yield a realistic value," the cost approach may be appropriate. *Id.* The court held that in view of the facts before it, the proper valuation for tax assessment purposes in the context of retail development, in which values were ascertainable was the fair market value approach. *Id.* at 618. A United States Tax Court has concluded similarly. In *Provitola v. Commissioner of Internal Revenue*, T.C. Memo.1990–523, 1990 WL 141930 (U.S.Tax Ct.1990), the court stated that "appraisers also limit reliance on the reproduction cost method to cases where the unusual character and use of property render

---

24. Howard does not argue any points related to the first three issues.

25. *See Northwest Airlines, Inc. v. County of Hennepin*, 632 N.W.2d 216, 221 (Minn.2001) (stating "that the cost approach is best suited for valuing special purpose property[.]"); *In re Winston–Salem Joint Venture*, 144 N.C.App. 706, 551 S.E.2d 450, 455 (2001) (stating "cost approach would not yield fair market value of the [mall] and

should not be relied upon as the primary approach[ ] to determine value."); *Best Foods v. Englewood Cliffs*, 19 N.J.Tax 266, 273 (2001) ("Notwithstanding its age, the property remains a corporate headquarters facility, uniquely designed for the special purposes of the owner. As such, it is most appropriately valued under the cost approach.").

other valuation methods inapplicable." (Quoting H. Babcock, *Appraisal Principles and Procedures* 113–21 (1980)). That court opined that the cost approach "as a means to estimate a range of value for intellectual property has much potential for error." *Id.* In *Provitola* the petitioner argued that the cost approach was the appropriate method to utilize in valuing his software product, which incidentally was to be sold by Radio Shack. This was so, according to petitioner because the uniqueness of his intellectual property made other valuation techniques less reliable. The *Provitola* court disagreed, stating that uniqueness may be a reason for using the cost approach, but in the event that other approaches may be used, they should.

Howard urged the court to rely on the cost approach appraisal performed by Dr. Sullivan.[26] Dr. Sullivan explained that intellectual assets may have "two major components: intellectual resources and intellectual equity." Resources reside within the minds of the employees, while equity is the tangible specific knowledge to which one asserts ownership rights. After this introduction, Dr. Sullivan described three different valuation methodologies: cost approach; market approach; and income approach. Dr. Sullivan dismissed the market approach explaining that "using the market approach requires that an equal or comparable piece of technology be sold and that the sale occur under a specific set of conditions. At the time of this report no such comparable technology or technology sale data had been identified." The income approach, which takes the "anticipated stream of benefits (income) less the anticipated stream of costs" was dismissed for similar reasons. Dr. Sullivan settled upon the cost approach in which value is determined by "quantifying the amount of money required to reproduce either a duplicate or the functional equivalent of the subject intellectual assets."

Using the cost approach, Dr. Sullivan evaluated two sources from which to determine value. He stated that NWS had planned to request a $1.5 million dollar appropriation from United States Congress to fund its own development of the weather radio. The other figure could be culled from the tax court opinion. Dr. Sullivan chose the NWS figures as he was "persuaded" these were more accurate estimates of the cost to produce the equivalent of Howard's technology.

Employing the reasoning of the *Provitola* court we conclude that the family court's decision to disregard Dr. Sullivan's cost approach was not an abuse of discretion. Because the intellectual property, along with the businesses, were sold, the amount a willing buyer would pay to a willing seller has been determined. That is the fair market value. Moreover, like the petitioner in *Provitola*, Howard's reliance on the uniqueness of his property is unconvincing for two reasons. First, the replacement value of this unique property does not represent the sales and earning potential of the property. Second, a value was available because Howard had sold the business and a specific figure, $1,058,945 was determined to represent his intellectual property and other rights.

**2. Based upon the facts of this case the fair market value was a reasonable method by which to value the intellectual property.**

Although Howard argues that the family court abused its discretion in not utilizing the cost approach, he does not present an argument as to why the fair market value approach was not the appropriate valuation method for the intellectual property at issue. Mei Li argues that the applicable Hawai'i property division law requires the use of fair market value plus or minus property separately owned by the contributing spouse on the date of marriage. Although we agree with Mei Li's position generally, it is not necessarily the appropriate measure for intellectual property in all cases.

Hawai'i has consistently employed fair market value appraisals to determine the value of property to be divided in a divorce action. *See Cassiday v. Cassiday,* 68 Haw. 383, 384–85 n. 4, 716 P.2d 1133, 1135 n. 4

**26.** Dr. Sullivan has a masters of science degree in R & D Management from Florida State University, Tallahassee, Florida. At the time of his report he was the President of Sullivan & Associates and an affiliate and managing director of Law & Economics Consulting Group, Inc.

(1986) (stating "it is equitable to award each divorcing party one-half of the after acquisition but during marriage real increase in the net value of property separately owned at the [time of marriage] or acquired during the marriage by gift or inheritance and still separately owned at the [time of divorce]."). Fair market value has been defined by this court as "the 'value in money of any property for which that property would sell on the open market by a willing seller to a willing buyer.' " *City & County of Honolulu v. Steiner*, 73 Haw. 449, 455, 834 P.2d 1302, 1306 (1992) (defining market value for purposes of real property valuation).[27] Inasmuch as intellectual property has not been the subject of equitable distribution in our courts, we have not developed a method of determining fair market value for such property.

In the context of intellectual property, the market approach determines "the value of the entire business enterprise which owns the intellectual property and then isolates the intellectual property assets sought to be evaluated." Goldscheider & Epstein, *Determining the Value of Technology and Setting Royalty Rates*, 4 NO. 10 J. Proprietary Rts. at 9. Generally, federal courts have dealt with appraisal methods more frequently than state courts because the bulk of the issues relate to copyright or patent law, both of which are governed by federal law.

In *United States v. Coviello*, 225 F.3d 54, 64 (1st Cir.2000), the issue of valuing intellectual property was discussed in the context of sentencing individuals who were in the business of selling stolen computer CD-roms. The defendants had approximately 42,000 CD-roms from Microsoft. In calculating the loss incurred by Microsoft, the court stated, that because the products at issue had a market value and the party relying on the cost approach put forth no authority or persuasive argument as to why the "ordinary market value approach should be abandoned," it ruled that the market value appraisal was appropriate for valuing intellectual property.

In *Mark IV Pictures, Inc. v. Commissioner of Internal Revenue*, T.C. Memo.1990–571, 1990 WL 165068 (U.S.Tax Ct.1990), the threshold question was whether the petitioners had established the value of the film rights they had allegedly transferred. The respondents argued that payments received by the petitioners were entirely for services rendered and not film rights. The tax court provided the established definition of "fair market value," and then explained that the inherent difficulty in valuing fair market value of intellectual property leads appraisers to set the price in the form of royalties. The court acknowledged that the uniqueness of intellectual property can make the determination of fair market value speculative. Despite this difficulty, however, the petitioners still had the burden of establishing value. Having found that the petitioners failed in their burden of proof, the tax court ruled that all the payments received were for services rendered and not film rights.

In *Precision Plating & Metal Finishing, Inc. v. Martin–Marietta Corp.*, 435 F.2d 1262, 1263 (5th Cir.1970) (per curiam) the court reviewed the trial courts findings and stated that:

> There is no established market value in the present case in the sense that there were a number of transactions of the same or similar article, the consensus of which reflects the price at which willing buyers and sellers would act. Fair market value here is synonymous with the investment value of the trade secret; that is, what an investor judges he should pay for the return he foresees by virtue of owning the process, taking into account the facts, circumstances and information which is available at the time.

*Id.* In that case, Precision Plating had "developed a secret process for the filling of pits, pores and porosity in metal castings to be used in housing the delicate guidance system of missiles[.]" *Id.* at 1263. Martin–Marietta did not contest liability, rather the issue was

---

27. The definition of market value need not vary depending on the type of property being appraised. The definition from *Steiner* is consonant with Black's Law Dictionary which defines market value as "the highest price a willing buyer would pay and a willing seller accept, both being fully informed, and the property being exposed for a reasonable period of time." Black's Law Dictionary at 670.

the amount of damages owed to Precision Plating for the loss of its trade secret. The court held that the value a reasonably prudent investor would pay was the best method of determining value.

In view of the reasoning of these cases, it is apparent that fair market value, although potentially difficult to determine, is an appropriate method of valuation of intellectual property so long as the information is available to make an adequate valuation. Thus, in the case *sub judice*, there are abundant facts from which the family court could adequately determine the value of Howard's intellectual property. For example, the Zinta Agreement set forth the obligations of Howard. He was to assist in the transition for up to two years, provide co-representation at Radio Shack meetings, assign any future Paignton payments, and give the buyer a right of first refusal on all new products he developed.

Inasmuch as trade secrets have been deemed property for purposes of Fifth Amendment rights and by statute are said to derive independent economic value, we find no reason to set values on trade secrets differently than other property rights. Therefore, we hold that, for purposes of determining the value of Howard's trade secrets, the family court did not abuse its discretion when it used fair market value. For the purposes of this case, we also hold that the use of fair market value was appropriate for determining the value of Howard's patents. We do not wish to foreclose the use of other valuation methodologies for intellectual property. In this case, values had already been set because the property had been sold, thus the fair market value was the most appropriate technique. However, we can conceive of other situations where different appraisal methodologies would surpass the fair market value in accuracy. In future situations, it will be incumbent upon the party with the burden of establishing values to define the methodology utilized and why it should be employed in place of the fair market value.

Pre-maritally, Howard solely owned the rights to his trade secrets. Those property rights vested at various times but before the 1976 marriage. After the marriage, Howard applied for and was issued two separate patents. Those patent rights, therefore, vested after marriage and are properly part of the marital estate. Howard argues that the trial court erred when it "found no competent evidence was offered by Scott or Dr. Sullivan[.]" According to Howard's expert, "every aspect of Howard's weather radio was governed by pre-marital trade secrets." This is simply not so. Had Howard never been issued a patent, his argument may have been more persuasive. The patent alters the nature of the property right. It is no longer protected solely by the conduct of the holder. Once the patent has been issued the full force of the laws of the United States act to protect the property. In dividing this property, it was incumbent upon the family court to value all of the assets, in both their pre-marital and marital forms.

Despite Howard's failure to provide evidence of market value and his failure to argue why this court should depart from its policy of valuing property through fair market value, it was within the family court's discretion to review the full record to determine an equitable value. The family court has set forth reasoned facts for its conclusion and explained its disregard of Dr. Sullivan's appraisal. There was no abuse of discretion.

This discussion also disposes of Howard's third point of error, in which he argues the family court erred in equally dividing the intellectual property between pre-martial and marital property. As discussed above, there were two separate vesting dates: (1) the date the property right in the trade secret vested, and (2) the date the property right in the patents vested. Moreover, the trial court found the value of the property increased by virtue of Mei Li's Taiwanese citizenship and her family's ability to open and run a manufacturing plant in Taiwan. The family court determined the values of these rights using the fair market value based upon the content of the entire record; this included the tax court opinion, the evidence submitted by the parties, and the testimony of the parties. As a result, the family court did not abuse its discretion when it divided the property between the pre-marital estate and marital es-

tate. We hold that the use of fair market value for the valuation of Howard's pre-marital and marital intellectual property was not an abuse of discretion.

## C. The trial court did not err in finding that the pre-marital intellectual property did not depreciate.

 Howard argues that the family court erred when, contrary to his expert's opinion, it found that there was no depreciation of pre-marital assets, *i.e.*, trade secrets. Howard stated that "trade secrets and patents—for different reasons—almost always decrease in value from the moment they enter the marketplace of ideas." In fact, Dr. Sullivan stated it "is well understood by economists [ ] [that] technology tends to decrease in value over time." These arguments are in direct conflict with the law.

Depreciation is relatively consistently defined. In *In re Tax Appeal of 711 Motors, Inc.*, 56 Haw. 644, 651, 547 P.2d 1343, 1348 (1976), this court defined "depreciation," by quoting from the state's internal revenue code, which provides that the "estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income."

The United States Supreme Court has noted that the U.S. Internal Revenue Code provides for the depreciation of intangible assets. *See Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 548, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993) (quoting 26 C.F.R. § 1.167–3 (1992)). The factors employed to determine the useful life of property include [28] the normal progress of art, economic changes, inventions, current developments in the trade, and the conditions peculiar to the taxpayers trade or business. *Liquid Paper Corp. v. United States*, 2 Cl. Ct. 284, 293 (Cl.Ct.1983); *see also In re 711 Motors*, 56 Haw. at 651, 547 P.2d at 1348 ("[R]easonable allowance for the exhaustion, wear and tear, and obsolescence of property

used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction."). "If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance." *Newark Morning Ledger*, 507 U.S. at 548, 113 S.Ct. 1670. Although the *Newark Morning Ledger* Court noted that extreme exactitude was not necessary in the depreciation inquiry, a deduction for depreciation would not be permitted on the basis of the unsupported opinion of the taxpayer.

In cases heard before the United States Claims Courts, it is settled law that trade secrets do not depreciate. *See Liquid Paper*, 2 Cl.Ct. at 297 ("The Government correctly contends that trade secrets and secret processes are generally not depreciable."); *Kaltenbach v. United States*, 66 Ct.Cl. 581, 587, 1929 WL 2496 (Cl.Ct.1929) (stating that a secret process not capable wear and tear and decay are not capable of obsolescence and therefore not depreciable); and *Yates Industr., Inc. v. Commissioner of Internal Revenue*, 58 T.C. 961, 974, 1972 WL 2584 (U.S.Tax Ct.1972) ("A trade secret generally has no ascertainable useful life unless such a useful life may be fixed relative to some particular circumstance."). This is so, because the useful life of a trade secret is measured by either disclosure of the secret or obsolescence. *Id.*

Even assuming *arguendo* we were to decide that trade secrets protected under state law were susceptible to depreciation, Howard has failed to present any facts to support his opinion that depreciation should be taken into account for purposes of valuation. Dr. Sullivan's report simply states that "it is well known among economists that technology depreciates over time." Dr. Sullivan failed to address trade secrets specifically. Howard argues that the "trade secret right disappears when the public uncovers the secrets

---

**28.** Other factors not relevant to our discussion of intellectual property include wear and tear, and decay of property and the taxpayer's policy of

repair, renewal, and replacement. *Liquid Paper Corp. v. United States*, 2 Cl.Ct. 284, 293 (Cl.Ct. 1983).

by fair and honest means." This may indeed be true, however, Howard testified that even at the time of divorce there was no product on the market the could compete with his invention. After close to twenty years and the issuance of a patent, the circuitry system of Howard's invention had not been duplicated. Although Howard also states that patents depreciate, we will not address the issue because, as the record clearly indicates, Howard has failed to put forth evidence of the threshold issue, that the value of the patent depreciated. We hold that the family court did not abuse its discretion when it declined to calculate a depreciation value for the trade secrets and patents.

### D. The family court did not abuse its discretion when it determined that the Circuit Patent constituted marital income.

 Howard seems to put forth two points supporting his contention that the Circuit Patent was pre-marital income. First, he reiterates his argument that the tax court "rejected" the characterization that the Paignton transaction was illusory. As discussed in section III.B.1., Howard misrepresents the record with this argument. The tax court was "suspicious" of the agreement with Paignton, and, while it didn't conclude the transaction was a "sham," it found the agreement to be "somewhat illusory." Howard relies on the tax court opinion to form the basis of his argument that, because the Circuit Patent was pre-marital property and Paignton paid him approximately $2 million dollars for the Circuit Patent, the entire sum should be distributed to him as his pre-marital property. The fallacy of this argument is clear. The rights in the Circuit Patent did not vest until after marriage, the payments from Paignton to Howard were made during marriage, and the tax court never ruled that the Circuit Patent was pre-marital property.

Howard argues that he paid capital gains tax "on the sale of his premarital intellectual property." Because the profits of a "marital partnership are normally taxed as ordinary income, the tax court's evaluation of [our] tax liability provides this Court a 'rough esti-

mate' of the division of marital property...." He appears to argue that the tax court implicitly held that the intellectual property was premarital income because the court applied a capital gains tax. Although the opening brief doesn't really explain or detail this argument, it appears to be: marital partnership profits are taxed as ordinary income, premarital capital assets are taxed as capital gains, thus, because he paid capital gains on the capital assets the tax court determined that the assets were premarital. Howard cites no authority for this interesting, yet unpersuasive argument.

The United States Internal Revenue Code § 1235 provides in relevant part that "[a] transfer ... of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset[.]" Case law interpreting this statute does not depart from the rule established by § 1235. In *Bell Intercontinental Corp. v. United States,* 180 Ct.Cl. 1071, 381 F.2d 1004, 1016 (1967), the court was required to determine whether the transfer of rights in the patent at issue was a license or a sale. A license, explained the court, would be taxed as ordinary income, whereas, a sale would be taxable as capital gains. *Id.; see also Lehman v. Commissioner of Internal Revenue,* 835 F.2d 431, 435 (2d Cir.1987) (holding that receipt of incentive award does not qualify for capital gains treatment because it was not made in consideration for a transfer in the patent rights); *Kueneman v. Commissioner of Internal Revenue,* 628 F.2d 1196, 1200 (9th Cir.1980) (explaining that to qualify for capital gains treatment, the full monopoly rights to make, use, and sell the patented invention must be transferred). Howard does not argue that it was not a sale, rather he argues that his marital status impacted the determination of his taxation. This argument falls clearly outside the established law under the Internal Revenue Code and case law interpreting the statutes at issue. The family court did not err when it determined that the Circuit Patent was marital income.

**E. We decline to address Howard's final point of error because he fails to properly comply with the mandates of HRAP 28(b)(3).**

 Howard argues, in his statement of points on appeal, that the family court judge ruled "that neither statute [HRS §§ 636–16 or 580–47] authorized [the family court] to award such [prejudgment] interest in this case." In the argument section of his brief, Howard provides a summary of cases supporting the proposition that prejudgment interest may be awarded at the discretion of the court.

HRAP Rule 28(b)(4)(C) requires the appellant to set forth the error, where in the record the error may be located, provide a copy of the ruling or judgment, and the objections made. Howard does not reference the order denying his motion for prejudgment interest. That order is silent regarding the applicability of HRS §§ 636–16 and 580–47. Howard did not provide a copy of the pertinent section of the transcript with his brief.[29] Howard's entire argument is found in one sentence in his points on appeal; "[n]othing in HRS Section 636–16 prohibits a family court judge from awarding prejudgment interest in a divorce case." In his argument section, Howard simply recites a series of cases in which it has been stated that the purpose of prejudgment interest is to undo injustice caused by delays. He does not apply these cases to the issue he raises, whether there exists a statutory right to prejudgment interest. Because Howard substantially failed to comply with HRAP Rules 28(b)(3) and 28(b)(4)(C) in this aspect of his opening brief, we decline to address the merits.

## IV. CONCLUSION

For the reasons discussed above, we affirm the judgment of the family court of the first circuit recalculating the amount of the marital estate and denying prejudgment interest.

**29.** HRAP Rule 28(b)(3) provides in relevant part that "[t]here shall be appended to the brief a copy of the judgment, decree, findings of fact and conclusions of law, order, opinion or decision relevant to any point on appeal, unless otherwise ordered by the court."