**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-11-0000583**
**31-DEC-2014**
**01:32 PM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

NICOLETA JACOBY, Plaintiff-Appellee/Cross-Appellant, v.
BENNETT JACOBY, Defendant-Appellant/Cross-Appellee

NOS. CAAP-11-0000583 and CAAP-12-0000083
(CONSOLIDATED)

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(FC-D NO. 08-1-281K)

DECEMBER 31, 2014

NAKAMURA, CHIEF JUDGE, LEONARD and GINOZA, JJ.

OPINION OF THE COURT BY LEONARD, J.

Defendant-Appellant/Cross-Appellee Bennett Jacoby
(**Bennett**) appeals from an April 14, 2011 Family Court of the
Third Circuit (**Family Court**) Order Re: Divorce Trial (**Order**) and
a July 5, 2011 Decree Granting Absolute Divorce and Awarding
Child Custody (**Divorce Decree**) that dissolved Bennett's marriage
with Plaintiff-Appellee/Cross-Appellant Nicoleta Jacoby
(**Nicoleta**).[1] Nicoleta cross-appeals from the Divorce Decree.

---

[1] The Honorable Aley K. Auna, Jr. presided.

Bennett raises sixteen points of error, arguing the Family Court erred, _inter alia_, in its valuation of Bennett's intellectual property (**IP**) for his capital contribution, its deviation from marital partnership principles and waiver of Nicoleta's equalization payment, its permanent alimony[2] and child support awards, and its requirement that Bennett maintain life insurance in an amount far greater than necessary to give reasonable security for his support obligations.

On cross-appeal, Nicoleta raises three points of error, challenging the Family Court's decision to: (1) include an automatic termination clause for her permanent alimony upon her cohabitation; (2) include Bennett's tax-free disability earnings as "Monthly Gross Income" on the Child Support Guidelines (**CSG**) worksheet; and (3) not award her one-half of Bennett's future disability benefits, if we conclude that the Family Court erred by awarding Nicoleta permanent alimony or by waiving her equalization payment.

I.   BACKGROUND

On December 9, 2008, Nicoleta filed a complaint for divorce against Bennett.

On February 18, 2009, the parties filed a Stipulation of the Parties Re: Temporary Custody, Visitation, Support, and Other Matters (**Pre-trial Stipulation**). Bennett and Nicoleta agreed temporarily to joint legal and physical custody of their two minor children and set forth temporary terms and conditions of their joint custody.

On October 12, 2009, Bennett filed a motion for a pre-trial determination regarding whether his future disability benefits are marital property subject to equitable distribution. No separate order was filed.[3]

---

[2]    "Alimony" and "spousal support" are used interchangeably.

[3]    Bennett claims, without citing to the record, that the Family Court orally ruled:

> To the extent that [Bennett's] future disability
> insurance benefits are simply to replace lost income
>                                          (continued...)

2

Bennett and Nicoleta's divorce trial was held on November 12, 13, 19, and 27, 2009. The date of the conclusion of the evidentiary portion of the trial (**DOCOEPOT**) was November 27, 2009. Nicoleta and Bennett both testified at trial, and each called an expert to testify about the value of Bennett's IP.

Nicoleta testified that she was born in Romania in 1969, and in 1985, she had surgery to remove an arterio-venous malformation in her brain. Following surgery, she was paralyzed on her "whole right side." When she came to the United States in 1990, she was still experiencing weakness in her right leg and hand.

Nicoleta stated that she met Bennett in California around May 1992, and they moved in together in June 1992. Nicoleta was twenty-three years old and Bennett was thirty-one years old at the time. Bennett was separated, but not yet divorced, from his former wife (**Mary Ann**) when he began living with Nicoleta. Nicoleta worked at Bennett's periodontist clinic in California, but Bennett did not pay her. She believed that they had a joint bank account, and she reported that Bennett had been "paying for everything."

Nicoleta and Bennett were married on June 12, 1993 (date of marriage, **DOM**), and Nicoleta continued to work in Bennett's office thereafter. Their son was born in June 1995, and their daughter was born in January 1997.

In late 1997, Nicoleta was diagnosed with multiple sclerosis (**MS**). Nicoleta reported that she underwent steroid treatments, which caused numbness.

The family moved to Hawai'i in May 1998. Bennett and Nicoleta purchased a home in August 1998. Nicoleta testified that she continued to have MS flare-ups, which required steroid

---

[3](...continued)
from [his] disability, those future benefits post-divorce are not a marital asset, and the family court lacks legal authority to divide or equitably distribute by way of offset his future disability income and cannot consider the present value calculation of his future disability income.

treatments. She continued to consult with her neurologist in California until 2007, and she also saw a neurologist in Hawai'i.

Nicoleta testified that her illness impacted her employment. In 1999, she worked part time at Hualalai Academy for its after-school program from about 2:30 to 5:00 p.m., five days a week. However, she had to quit "because after a while, my numbness and my MS was flaring up, and I had to go to the hospital to have the IV steroids." In 2005, she tried to work with Bennett as his assistant when he started "working on the charity van, . . . but I did not last." She worked for less than a week before her MS caused her to quit. At the time of trial, she felt that she was unable to work because "[m]y shoulder hurts. My arm -- I cannot be on the computer too long. . . . I'm very tired."

Nicoleta also testified that she has optic neuritis, which might cause her to go blind. In April 2009, she was diagnosed with brain hemorrhaging and must have an annual CT scan "to watch that aneurysm that broke that is in my brain." She stated that, in May 2009, she was "diagnosed with carpal tunnel syndrome, the nerve on my left hand, my good hand, . . . the nerve is damaged" and that her left shoulder problems require surgery. Nicoleta's medical problems require numerous medications that are very costly. Even with insurance, Nicoleta testified that she spent about $885 per month for her medications.

At DOCOEPOT, Nicoleta was receiving about $5,500 per month in alimony and $1,970 per month in child support. Nicoleta requested that Bennett maintain his $1.5 million life insurance policy, which he had initiated during their marriage.

Nicoleta further testified that the climate, single-story design, and pool at the parties' marital residence helped her cope with her MS. If Nicoleta does go blind, the familiarity with the house would be "very good for [her]" because she knows "how to get around [the house] and everything." However, she stated that the upkeep of the house is costly.

Bennett testified that he married Mary Ann around May 1989. In December 1992, a judgment of divorce from Mary Ann was filed in California, and he signed a marital termination agreement or agreement incident to divorce (**AITD**). The AITD included a $10,000 settlement payment to Mary Ann to "sign off on" his IP or "in effect release any claims that she might have to an interest in it."

Bennett testified that his IP stemmed from the ideas that resulted in his periodontal endoscope, which utilized fiber optics to allow dentists to view beneath teeth without surgery, and which came to him in 1987. Bennett's attorney filed patent applications for his ideas. Bennett created a successful working prototype in late 1992, and used it on patients in late 1992 or early 1993. Bennett testified that "a tremendous amount of development" occurred between when Mary Ann released claims on his IP in December 1992, and the DOM in June 1993. Thus, "what I brought into the marriage with Nicoleta was different from what Mary Ann signed off on." His patent allowance was issued in February 1993, two months after the AITD and four months before DOM.

At DOCOEPOT, Bennett was receiving disability payments in the amount of about $16,334 per month, tax-free. Bennett's disability insurance policy provides for five-percent annual increases. Bennett testified that he paid annual premiums for the policy during his marriage to Nicoleta, until his premiums were waived when he was found to be disabled after a diagnosis of myofascial pain dysfunction syndrome following a 1996 surfing accident.

At DOCOEPOT, Bennett was earning about $1,500 per month working part-time as a periodontist. He was also receiving about $1,000 per month in royalties from his invention until December 2011, and about $9,000 per month from various investments.

Bennett testified that the expenses for Bennett, Nicoleta, and their two children from January 2007 to June 2008, averaged $9,348 per month.

Both parties offered expert testimony on the value of Bennett's IP asset. Bennett's valuation expert was Gary Kuba (**Kuba**). Nicoleta's expert was Christian Tregillis (**Tregillis**).

Kuba valued Bennett's periodontal endoscopy device patent applications as of DOM at $4,648,000. To arrive at his valuation, Kuba "ultimately relied on . . . a projection prepared by Wendell Ebling [(**Ebling**)], who was the president of a company back in 1993 called Bioview, who had dental sheaths among other products." Kuba explained his basic valuation model as follows:

> You start off with cash flows. What's the expected cash flows? You apply a discount rate to it. Cash flows divided by this discount rate gives you what the value is, so it's pretty straightforward.
> You're dealing with two variables. If cash flows go higher and the discount rate is constant, you get a higher value. If the cash flows remain the same, the discount rate goes down, you get a higher value. Conversely, if the discount rate goes up, you get a lower value. So, you know, the fundamentals is [sic] pretty straightforward. We're dealing with two variables here.

Kuba used Ebling's projected cash flow and a twenty percent discount rate. Kuba said "there's no evidence that I'm aware of" that indicated that Ebling's projections were inflated. However, he acknowledged that Ebling's projections may have been "overinflat[ed]" to "entice" Bennett into a partnership. Kuba acknowledged that "the only relevant person that we were able to talk to was [Bennett]" because Ebling had since passed away.

Kuba based the twenty percent discount rate "on what's called a capital asset pricing model." He explained how this model arrives at a discount rate. Kuba's arrival at a twenty percent discount rate "widely varies" from Tregillis's.

Kuba explained why he thought Tregillis's valuation of $101,000 was unreasonable. Kuba further disagreed with Tregillis's opinion that the property equalization of $10,000 to Mary Ann in the AITD should be considered in the valuation because "clearly there was no analysis establishing that it was fair market value."

Tregillis valued the IP asset at $101,000. He explained that consideration of "future information is limited" and that he considered "information which gives insight into what

would have been expected by [a willing] buyer and [a willing] seller as of the valuation date." Thus, he limited his analysis "to what was known or knowable in establishing what expectations were on the valuation date [DOM]." He explained:

> [U]ltimately I wanted to look at what was expected or knowable, what a willing buyer and a willing seller would have expected as of the date of transaction. And looking at that range of possibilities, success, middle of the road, not so successful, or complete failure, those possibilities, ultimately that's what the value is. When you do a weighted average, combining the probabilities of each of those things playing out, that's what drives the value.

Tregillis explained that he used the actual stream of total revenues as the expected scenario instead of the Ebling projections, which Kuba used. Tregillis thought that the Ebling projections were inflated because they were created by Ebling with the intention of attracting Bennett into a partnership. He also explained that his 42.5 percent discount rate was "conservative" due to Bennett's early stage of investment at DOM.

On April 14, 2011, the Family Court filed the Order Re: Divorce Trial, which set forth its findings of fact (**FOFs**) and conclusions of law (**COLs**). In the Order, the Family Court found, inter alia, that: (1) Bennett and Nicoleta had formed a Premarital Economic Partnership (**PEP**) in June 1992 that had lasted until DOM on June 12, 1993, and the fact that Bennett was married to Mary Ann "at the commencement of the parties' PEP has no bearing on whether a PEP was formed"; (2) "Tregillis' findings and conclusions are more persuasive" than Kuba's regarding the value of Bennett's IP, and "Tregillis' opinion of the value of [Bennett's] IP at DOM of $101,000 is reasonable, trustworthy, and credible"; (3) "it would be just and equitable to award [Nicoleta] permanent spousal support of $4,000 per month" that will "terminate upon the death of either party or upon the remarriage or cohabitation of [Nicoleta]"; (4) Bennett should pay Nicoleta $2,069 per month in child support; (5) Bennett "has stipulated that he will pay the premiums" for Nicoleta's Kaiser HIPAA Platinum Plan health plan or a "reasonable equivalent if it is not available"; (6) Bennett must maintain his $1.5 million life insurance policy with Nicoleta "being the exclusive primary

beneficiary for so long as he has an obligation to pay child support or alimony"; (7) Nicoleta should be awarded the marital residence; and (8) "sufficient valid and relevant considerations [(**VARCs**)] to deviate from marital partnership principles" exist, and "[i]t would be just and equitable to not require [Nicoleta] to pay the equalization payment."

On July 5, 2011, the Family Court entered the Divorce Decree, which, among other things: (1) ordered Bennett to directly pay Nicoleta $4,000 per month in permanent alimony; (2) awarded joint legal and physical custody of their two minor children; (3) ordered that Bennett maintain existing levels of medical insurance for the two children; (4) awarded the marital residence to Nicoleta, who is responsible for the real property taxes upon transfer of title to her; and (5) ordered that Bennett pay off Nicoleta's car loan on her 2008 Honda with existing marital assets.

On August 3, 2011, Bennett filed a timely notice of appeal. On August 16, 2011, Nicoleta filed a timely notice of cross-appeal.

On October 17, 2011, Nicoleta filed a post-decree motion to enforce the Divorce Decree, requesting, inter alia, that Bennett pay for a different medical insurance plan with a higher monthly premium of $429.13 because the original Kaiser HIPPA Platinum Plan (with a premium of $290) no longer existed. The Family Court granted the motion and filed an order on November 28, 2011 (**Post-Decree Enforcement Order**), stating that "[t]he Kaiser HIPPA Plan 20/RX (as opposed to the Kaiser HIPPA Plan 30/RX)[4] is a reasonable equivalent to the Kaiser HIPPA Platinum Plan." The Family Court also ordered Bennett to pay

---

4       The Kaiser HIPAA Platinum Plan was no longer available, and Nicoleta was only eligible for two other plans: (1) Kaiser HIPPA Plan 20/RX, which costs $429.13 per month; and (2) Kaiser HIPPA Plan 30/RX, which costs $365.77 per month.

interest on the sum of $594,805[5] from July 5, 2011 through October 5, 2011.

II.  POINTS OF ERROR

Bennett raises the following points of error on appeal:

(1)  The Family Court clearly erred by finding that Bennett and Nicoleta had formed a PEP in June 1992 while he was still married to Mary Ann.

(2)  The Family Court clearly erred in its IP valuation of Bennett's periodontal endoscope.  The Family Court further erred in not applying Teller v. Teller, 99 Hawai‘i 101, 53 P.3d 240 (2002).

(3)  The Family Court abused its discretion by awarding Nicoleta permanent spousal and child support without considering the effect of property division on the parties' gross monthly incomes and clearly erred in its FOFs:

(a)  FOF 108:  "[Nicoleta's] present household and transportation expenses, excluding her automobile loan payments, are $3,327 ($4,153 - $826). . . . These expenses are reasonable."

(b)  FOF 109:  "[Nicoleta's] personal monthly expenses, including medical and dental, is [sic] $2,910. . . . Given the parties [sic] present life style, these expenses are reasonable."

(c)  FOF 114:  "[Bennett] also receives about $9,064 per month income from his bonds and Certificates of Deposit accrued interest."

(d)  FOF 117:  "[Bennett's] total gross monthly income (without considering the increase calculation of the monthly tax free disability payments; [Bennett] opines that gross

_____

[5]    The Divorce Decree awarded Nicoleta one-half of the total value of the parties' "Bank/Savings, Sec., Ret., Etc." asset (**Accounts**), which the Family Court valued at $1,345,726.  Nicoleta had possession of assets with a DOCOEPOT value of $750,921, and Bennett assigned her title to these assets.  Because the Family Court waived Nicoleta's $588,677 equalization payment, Bennett owed her $594,805 ($1,345,726 - $750,921).

The Family Court ordered that Bennett pay $14,666.40 in interest on his post-decree payment to Nicoleta of $594,805.  The interest was calculated by multiplying $162.96 per day by 90 days.

monthly income would be $28,375 on the $16,343 now being received) is $29,402."

(e) FOF 122: "Under the circumstances of this case, it would be just and equitable to award [Nicoleta] permanent spousal support of $4,000 per month."

(4) The Family Court abused its discretion by deviating from marital partnership principles and waiving Nicoleta's $588,677 equalization payment.

(5) The Family Court abused its discretion by extending Nicoleta's inflated temporary support orders for nineteen months between DOCOEPOT on November 27, 2009 and the filing of the Divorce Decree on July 5, 2011.

(6) The Family Court clearly erred by undervaluing a 2008 Honda vehicle awarded to Nicoleta at $2,488 with regard to its allocation of the parties' assets, as follows:

(a) The Family Court failed to account for Bennett's payoff of the vehicle when dividing the parties' cash marital assets, resulting in Bennett paying off the vehicle not out of the total pre-division marital assets, as he agreed to do, but out of his own one-half share of post-division assets.

(b) The Allocation Chart, which was part of FOF 141, incorrectly valued the vehicle at $2,488 when Nicoleta's testimony at trial and her Asset and Debt statement, filed October 19, 2009, indicated that the vehicle was worth $24,300.

(7) The Family Court abused its discretion by allowing Nicoleta to take the 2011 real property tax deductions when Bennett made the payments even after the Divorce Decree was filed on July 5, 2011.

(8) The Family Court abused its discretion by ordering Bennett to maintain his life insurance policy because doing so was excessive, unduly burdensome, and not consistent with the Family Court's other financial orders, as follows:

(a) In the event that Bennett dies without the required insurance, his estate should only be held liable for the actual dollar amount of any outstanding child support obligation, not the full insured value of $1.5 million as ordered.

(9) The Family Court abused its discretion by ordering Bennett to pay Nicoleta's increased medical insurance premiums and by not re-calculating its original child and alimony awards, as follows:

(a) The Family Court did not have jurisdiction to grant Nicoleta's motion for increased monthly payments pending appeal.

(b) FOFs 124-125 are erroneous because the Family Court did not adjust its original child support calculation to reflect the increased monthly premium payments.

(10) The Family Court erred by ordering Bennett to pay child support directly to Nicoleta in the Divorce Decree where the decree did not include certain required findings and statutory language.

(11) The Family Court abused its discretion by ordering Bennett to "maintain existing levels of [health] insurance for the parties' minor children" when he was also ordered to pay for all of their uncovered medical and dental costs.

(12) The Family Court abused its discretion by providing for equalization of unforeseen tax consequences of property division in the Divorce Decree, as follows:

(a) Neither Bennett nor his counsel signed Nicoleta's proposed divorce decree, agreed to this language, or indicated that Bennett assumed or intended there to be no tax consequences of property division.

(b) Bennett did not agree to be responsible for the tax consequences arising out of any of Nicoleta's decisions as to the assets she received pursuant to the orders.

(13) The Family Court clearly erred by awarding Bennett and Nicoleta their individual bank savings and checking accounts, but then including those same assets as part of the Accounts on the Allocation Chart as part of the assets to be evenly divided between the parties.

(14) The Family Court abused its discretion by including in the Divorce Decree nonstandard, overreaching

provisions concerning physical custody of the children that were not discussed at trial or agreed to by the parties, as follows:

> (a)   The Divorce Decree provides:  "Neither party shall engage in any inappropriate or sexually related conduct, talk, conversations, or activities in the presence or hearing of the children."

> (b)   "The orders at pages 3-7 of the Decree concerning child custody and visitation contain numerous additional non-standard orders including language regarding the right of first refusal[.]"

> (15) The Family Court abused its discretion by holding Bennett financially responsible for the children's extracurricular activities and then including those same costs as part of Nicoleta's expenses when calculating her support needs.

> (16) The Family Court abused its discretion by ordering Bennett to pay interest on his post-decree payment of Nicoleta's $594,805 property distribution award, because:

> (a)   The Family Court did not have jurisdiction to make such an order while this appeal was pending.

> (b)   There was no monetary judgment entered against Bennett that would justify an order for statutory interest.

III. <u>APPLICABLE STANDARDS OF REVIEW</u>

> Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion.  Thus, [appellate courts] will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

<u>Kakinami v. Kakinami</u>, 125 Hawaiʻi 308, 311-12, 260 P.3d 1126, 1129-30 (2011) (citations omitted).

"Whether the parties cohabitated and had an economic partnership prior to marriage are questions of fact.  As such, the court's finding regarding the partnership is reversible only if it is clearly erroneous."  <u>Aiona-Agra v. Agra</u>, No. 30685, 2012 WL 593105, at *3 (App. Feb. 23, 2012) (citations omitted).

> There is no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in [Hawaii Revised Statutes (**HRS**)] § 580-47.  We have said that the discretionary power of a trial court in dividing and distributing property in a matrimonial action under HRS § 580-47 will not be disturbed in the absence of a showing of abuse.  Further, the division and distribution of property pursuant to a divorce need not be equal but should be just and equitable.

Au-Hoy v. Au-Hoy, 60 Haw. 354, 357, 590 P.2d 80, 82 (1979) (citations omitted).

> The Partnership Model requires the family court, when deciding the division and distribution of the Marital Partnership Property of the parties part of divorce cases, to proceed as follows:  (1) find the relevant facts; start at the Partnership Model Division and (2)(a) decide whether or not the facts present any valid and relevant considerations authorizing a deviation from the Partnership Model Division and, if so, (b) itemize those considerations; if the answer to question (2)(a) is "yes," exercise its discretion and (3) decide whether or not there will be a deviation; and, if the answer to question (3) is "yes," exercise its discretion and (4) decide the extent of the deviation.

Collins v. Wassell, 133 Hawai'i 34, 58, 323 P.3d 1216, 1240 (2014) (citations omitted).

> The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard.  A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.  "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

> On the other hand, the family court's COLs are reviewed on appeal de novo, under the right/wrong standard.  COLs, consequently, are not binding upon an appellate court and are freely reviewable for their correctness.
> . . . .

> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (citation and internal quotation marks omitted; format altered).

"It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact."  Id. (citation and internal quotation marks omitted).

An appellate court
reviews rulings on interest pursuant to HRS §§ 478-3[6]
and 636-16[7] for abuse of discretion.

The trial court abuses its discretion if it
bases its ruling on an erroneous view of the law or on
a clearly erroneous assessment of the evidence. Stated
differently, an abuse of discretion occurs where the
trial court has clearly exceeded the bounds of reason
or disregarded rules or principles of law or practice
to the substantial detriment of a party litigant.

Chun v. Bd. of Trs. of Emps.' Ret. Sys. of Haw., 106 Hawai'i 416,
430, 106 P.3d 339, 353 (2005) (citation omitted; format altered).

IV. DISCUSSION

A. The Pre-Marital Economic Partnership

The Supreme Court of Hawai'i has held:

[A] premarital economic partnership is formed when,
"prior to their subsequent marriage, [two people] cohabit
and apply their financial resources as well as their
individual energies to and for the benefit of each other's
person, assets, and liabilities."

Collins, 133 Hawai'i at 45, 323 P.3d at 1227 (quoting Helbush v.
Helbush, 108 Hawai'i 508, 515, 122 P.3d 288, 295 (App. 2005)).

Here, the Family Court found that Bennett and Nicoleta
had formed a PEP in June 1992, even though Bennett was still
married to Mary Ann at the time. Bennett challenges FOFs 21 and
22:

21. The parties formed a [PEP] in June 1992 and this
lasted until DOM. They contributed their financial
resources as well as their individual energies and efforts
to and for the benefit of each other's person, assets, and
liabilities.

22. Under the circumstances of this case, whether
[Bennett] was still married to [Mary Ann] at the

---

[6]     HRS § 478-3 (2008) provides:

§ 478-3 On judgment. Interest at the rate of ten per
cent a year, and no more, shall be allowed on any judgment
recovered before any court in the State, in any civil suit.

[7]     HRS § 636-16 (1993) provides:

§ 636-16 Awarding interest. In awarding interest in
civil cases, the judge is authorized to designate the
commencement date to conform with the circumstances of each
case, provided that the earliest commencement date in cases
arising in tort, may be the date when the injury first
occurred and in cases arising by breach of contract, it may
be the date when the breach first occurred.

commencement of the parties' PEP has no bearing on whether a PEP was formed. [Bennett] and [Mary Ann] were separated at least four months before [Bennett] and [Nicoleta] began to cohabit.

Although we agree with Bennett's contention that the Family Court erred when it found that Bennett's on-going marriage to Mary Ann had "no bearing" on whether a PEP was formed, under the circumstances of this case, we nevertheless conclude that the the Family Court did not err in finding and concluding that a PEP was formed between Bennett and Nicoleta in June of 1992.

Bennett contends that the Family Court "erred in so far as the PEP affected [Nicoleta's] claim to property yet to be distributed between [Bennett] and [Mary Ann]." In Chen v. Hoeflinger, the husband similarly argued that he could not have entered a PEP with the wife while he was still married to a prior wife, because if "a premarital economic partnership can occur even when a party is still married to someone else, it means that a party can be subjected to two divisions of marital property at the same time from different partners." Chen v. Hoeflinger, 127 Hawai'i 346, 360, 279 P.3d 11, 25 (App. 2012) (internal quotation marks). Considering all of the circumstances of the case, not just the husband's marital status at the time the PEP was allegedly formed, this court rejected that argument:

> Contrary to [husband's] argument, HRS § 580-47 does not provide for the division of property for mere cohabitation; therefore [a party] could not be subject to simultaneous divisions of marital property from different partners under the statute. . . . [I]t does not contravene a just and equitable division of property to consider the parties' premarital cohabitation, even though one of the parties might have been legally married to someone else at that time.

Id. (internal citation omitted). The court further held that

> [Husband] and his prior wife entered into a Property Settlement effective on January 26, 1993, six months after the Family Court found that [husband] and [wife] established a premarital economic partnership commencing in July 1992. There is nothing in the record to suggest, and [husband] does not assert, that any of the property at issue in this case was also subject to the Property Settlement with his prior wife.

Id.

15

In the instant case, the Family Court found that Bennett and Mary Ann separated around February 1992 and divorced in April 1993. Bennett and Nicoleta began to cohabit in June 1992, and continued to live together until DOM. Bennett and Mary Ann were thus separated for at least four months before Bennett and Nicoleta began to cohabit. The fact that Bennett was still married to Mary Ann is certainly a relevant nonfinancial aspect of Bennett and Nicoleta's premarital relationship, and under different circumstances, might support a finding and conclusion that a PEP was not formed. However, as in Chen, the fact that Bennett's divorce was not finalized until April 1993 does not preclude a finding of a PEP with Nicoleta.

Bennett financially supported Nicoleta for the majority of their cohabitation before marriage, if not the entire time, and Nicoleta worked about three days a week at Bennett's periodontal clinic from June 1992 until DOM without receiving any compensation. Nicoleta testified that they had joint bank accounts starting in 1992. The unchallenged FOFs demonstrate that, during the period of their premarital cohabitation, Bennett and Nicoleta "cohabit[ed] and appl[ied] their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities." Chen, 127 Hawaiʻi at 358-59, 279 P.3d at 23-24 (citation omitted). Bennett suggests that the finding of a PEP allowed Nicoleta to claim property that might have been subject to a claim by Mary Ann, but cites no supporting evidence. Thus, we conclude: (1) the Family Court's finding that Bennett's marital status had "no bearing" on whether Bennett and Nicoleta formed a PEP was harmless error, perhaps best construed as an overstatement of Chen's holding that the existing marital status does not per se preclude the formation of a new PEP; and (2) the Family Court's finding of a PEP is supported by substantial evidence and, therefore, is not clearly erroneous.[8]

---

[8] The Family Court's use of the DOM in valuating the parties' capital contributions, notwithstanding the Family Court's finding that they
(continued...)

B.    The IP Valuation

The Family Court relied on the IP valuation by Nicoleta's expert, Tregillis, rather than that by Bennett's expert, Kuba.  We cannot conclude that the Family Court clearly erred by finding in FOFs 79 and 80 that Tregillis's opinion was "reasonable, trustworthy, and credible" and his "findings and conclusions [were] more persuasive" than Kuba's.  It is well settled that "an appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence; this is the province of the trial judge."  Booth v. Booth, 90 Hawai'i 413, 416, 978 P.2d 851, 854 (1999) (citations, internal quotation marks, and brackets omitted).  Here, as in Booth, the Family Court

> considered the evidence presented and determined that [Kuba's] testimony was not a reliable representation of the net equity of [Bennett's endoscope prototype] on the [DOM]. . . . Because the assessment of the weight of [Bennett's] evidence properly lay within the sound discretion of the family court, [we lack] a basis for setting aside the family court's findings on appeal.

Id. (format altered).

We also reject Bennett's argument that the Family Court erred in distinguishing Teller, wherein the supreme court stated:

> Theories of valuation of [IP] must take into account the highest and best usage in light of the most reasonable and legal use of the [IP], that is physically possible, appropriately supported, and financially feasible, and that results in the highest value.

Teller, 99 Hawai'i at 112, 53 P.3d at 251 (citation, internal quotation marks, and brackets omitted).  The court further held:

> [F]air market value, although potentially difficult to determine, is an appropriate method of valuation of [IP] so long as the information is available to make an adequate valuation. . . . We do not wish to foreclose the use of other valuation methodologies for [IP].  In this case, values had already been set because the [IP] had been sold, thus the fair market value was the most appropriate technique.  However, we can conceive of other situations where different appraisal methodologies would surpass the fair market value in accuracy.  In future situations, it will be incumbent upon the party with the burden of

---

[8] (...continued)
formed a PEP, is not challenged on appeal.

> establishing values to define the methodology utilized and why it should be employed in place of the fair market value.

Id. at 115, 53 P.3d at 254 (format altered).

This case is distinguishable from Teller because Bennett's periodontal endoscope had not been sold or commercialized before DOM. Thus, the Family Court did not clearly err in determining that fair market value was not the most appropriate technique; as the Family Court noted in FOF 58, "Tregillis used the Income Approach, which appears to be the most appropriate under the circumstances of this case[.]" As the Family Court explained in FOF 59:

> In Teller, the product containing the invention was being manufactured and marketed prior to DOM, unlike the instant case. There, the court held that the "values had already been set because the property had been sold, thus the fair market value was the most appropriate technique." [Teller, 99 Hawai'i at 115, 53 P.3d at 254.] However, the Teller court indicated that it did "not wish to foreclose the use of other valuation methodologies for [IP] . . . . In future situations, it will be incumbent upon the party with the burden of establishing values to define the methodology utilized and why it should be employed in place of the fair market value." Id.

The Family Court's adoption of Tregillis's "Income Approach" valuation theory rather than Kuba's "Relief from Royalty Approach," which is a hybrid of the income and market value methods of valuation, where the Family Court determined, inter alia, there was insufficient data supporting a fair market value method, was not clearly erroneous.

C.    The Calculation of Spousal and Child Support

The Family Court awarded permanent monthly alimony of $4,000 and child support of $2,069 to Nicoleta. These awards were both based, in part, on its finding that Bennett's total gross monthly income before deductions for support awards and medical premiums was $29,402: $16,343 from disability payments, $9,064 interest and dividend income from bonds and Certificates of Deposit (**Investment Income**), $1,267 royalty income from his IP, and $2,728 part-time income from his part-time periodontist practice. For the purposes of calculating child support, the Family Court calculated Bennett's gross monthly income to be

$25,112: $29,402 monthly income - $4,000 for alimony - $290 for Nicoleta's medical insurance premiums.

1. **Spousal Support**

Bennett argues that the $4,000 per month spousal support award "exceeded [Nicoleta's] reasonable needs[.]" He challenges, inter alia, FOFs 108 and 109, which state that, "[g]iven the parties['] present life style," Nicoleta's monthly household, transportation, and personal expenses of $6,237 are "reasonable."

HRS § 580-47(a) (Supp. 2013) provides, in relevant part:

> In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:
>
> (1)   Financial resources of the parties;
> (2)   Ability of the party seeking support and maintenance to meet his or her needs independently;
> (3)   Duration of the marriage;
> (4)   Standard of living established during the marriage;
> (5)   Age of the parties;
> (6)   Physical and emotional condition of the parties;
> (7)   Usual occupation of the parties during the marriage;
> (8)   Vocational skills and employability of the party seeking support and maintenance;
> (9)   Needs of the parties;
> (10)  Custodial and child support responsibilities;
> (11)  Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;
> (12)  Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and
> (13)  Probable duration of the need of the party seeking support and maintenance.

The Intermediate Court of Appeals (**ICA**) has previously identified several factual questions that the Family Court must consider in calculating spousal support:

> The first relevant circumstance is the payee's need. What amount of money does he or she need to maintain the standard of living established during the marriage? The second relevant circumstance is the payee's ability to meet his or her need without spousal support. Taking into account the payee's income, or what it should be, including the net income producing capability of his or her property, what is his or her reasonable ability to meet his or her need without spousal support? The third relevant

circumstance is the payor's need. What amount of money does he or she need to maintain the standard of living established during the marriage? The fourth relevant circumstance is the payor's ability to pay spousal support. Taking into account the payor's income, or what it should be, including the income producing capability of his or her property, what is his or her reasonable ability to meet his or her need and to pay spousal support?

Wong v. Wong, 87 Hawaiʻi 475, 485, 960 P.2d 145, 155 (App. 1998).

In FOFs 92 to 107, the Family Court found that Nicoleta had suffered from numerous ailments since the age of sixteen, including a brain tumor, partial paralysis, optic neuritis, multiple sclerosis, a brain aneurysm, Hepatitis C, carpal tunnel syndrome, anemia, migraine headaches, and shoulder problems. The Family Court also found that as a result of these ailments, Nicoleta was "medically unable to pursue any gainful employment[.]" Finally, the Family Court found that the parties had been married for sixteen years, and that Bennett had been the sole financial support for the family for the majority of that time. Based on these FOFs, we cannot conclude that the Family Court's finding that "it would be just and equitable to award [Nicoleta] permanent spousal support" constituted clear error. Nor has Bennett met his burden on appeal to demonstrate that the Family Court clearly erred in determining the amount of Nicoleta's reasonable monthly expenses.

However, as Bennett argues, the Family Court included the entire amount of the Investment Income ($9,064) as part of Bennett's income and none of it as part of Nicoleta's income, even though the Family Court awarded 50% of the Accounts, the underlying assets generating this Investment Income, to Nicoleta. The Family Court clearly erred in this regard and, therefore, utilized erroneous income assumptions for both parties when it determined that Nicoleta was entitled to $4,000 per month in spousal support.

Bennett also argues that the Family Court abused its discretion in failing to consider that: (1) "when [Bennett] turns 65, if not earlier, he will no longer be eligible to receive his

20

disability income;" and (2) "because the duration of the parties'
marriage is over ten years, [Nicoleta] will be eligible for
social security benefits when she reaches retirement age." These
arguments are to no avail; HRS § 580-47(a) does not require the
Family Court to predict changes in the parties' incomes that will
not occur for over ten years. "'The amount of alimony is to be
determined upon a realistic appraisal of the situation of the
parties at the time of the divorce.'" Lumsden v. Lumsden, 61
Haw. 338, 343, 603 P.2d 564, 568 (quoting Richards v. Richards,
44 Haw. 491, 516, 355 P.2d 188, 202 (1960)). Furthermore, HRS
§ 580-47(d) provides for future modification of spousal support
orders upon a showing of material changes in circumstances or
other good cause.[9] Although the Family Court properly exercised
its discretion at the time of the divorce to limit its
consideration to the parties' present circumstances, this
decision will not preclude a later determination that the
termination of Bennett's disability payments could be considered
a material change in circumstances, depending on the other
circumstances existing at that future time.

  The Family Court's findings show that it carefully
considered all of the factors provided in HRS § 580-47(a) when it
determined that Nicoleta was entitled to spousal support.
However, the Family Court abused its discretion in ordering
Bennett to pay $4,000 per month in spousal support to Nicoleta
based on the erroneous allocation of the Investment Income

---

[9]  HRS § 580-47(d) provides, in relevant part:

> Upon the motion of either party supported by an
> affidavit setting forth in particular a material
> change in the physical or financial circumstances of
> either party, or upon a showing of other good cause,
> the moving party, in the discretion of the court, and
> upon adequate notice to the other party, may be
> granted a hearing. . . . The court, upon such hearing,
> for good cause shown may amend or revise any order and
> shall consider all proper circumstances in determining
> the amount of the allowance, if any, which shall
> thereafter be ordered.

generated by the parties' Accounts, which were divided equally between them.

    2.   <u>Child Support</u>

        Bennett argues that because the Family Court clearly erred in its calculation of both parents' Monthly Gross Incomes, the resulting child support award was clearly erroneous, and thus the Family Court abused its discretion in awarding $2,069 per month in child support to Nicoleta.  We agree.

        Child support calculations are based in part on the respective Monthly Gross Incomes of the parents.  See HRS §§ 571-52.5 (2006), 576D-7 (2006), 576E-15 (2006), 2010 Hawai'i Child Support Guidelines[10] at § II.A.1.  Both HRS §§ 576E-15 and 571-52.5 provide that the family courts must use the CSG to calculate support awards "except when exceptional circumstances warrant departure."  In the instant case, the Family Court erroneously calculated both Bennett's and Nicoleta's incomes for the purpose of calculating child support in FOFs 124 and 125, resulting in an erroneous child support award.

        Based on its FOFs 112-116 regarding Bennett's sources of income, the Family Court found in FOF 117 that Bennett's total gross monthly income before deductions for Nicoleta's spousal support and medical premiums was $29,402:  $16,343 in disability payments, $9,064 in Investment Income, $1,267 in royalty income, and $2,728 in income from his part-time periodontist practice.  Using this calculation, the Family Court then found in FOF 125 that Bennett's Monthly Gross Income for the purposes of calculating child support was $25,112:  $29,402 total monthly income before spousal support and medical premiums, minus $4,000 for spousal support, minus $290 for Nicoleta's medical insurance premiums.  The Family Court also found in FOF 124 that Nicoleta's

---

        [10]    <u>See</u> 2010 Hawai'i Child Support Guidelines, <u>available</u> <u>at</u> http://www.courts.state.hi.us/self-help/courts/forms/oahu/ child_support.html (last visited December 22, 2014).

gross monthly income was $4,290: $4,000 spousal support plus $290 medical insurance premiums.

These income calculations were clearly erroneous. The Family Court clearly erred in FOF 114 by attributing the total $9,064 Investment Income to Bennett when it had awarded Nicoleta one-half of the underlying income-generating assets. The Family Court should have attributed to Nicoleta the monthly income generated by her one-half share of these assets when determining her monthly income in FOF 124, and decreased Bennett's monthly income in FOF 125 accordingly. Accordingly, the Family Court erred when it calculated monthly child support in the amount of $2,069.

D.    Waiver of Equalization Payment

Bennett challenges FOF 146, which states that "[i]t would be just and equitable to not require [Nicoleta] to pay the equalization payment" of $588,677. The Family Court arrived at FOF 146 after finding in FOF 145 that "there are sufficient valid and relevant considerations to deviate from marital partnership principles." The Family Court did not clearly err in finding sufficient VARCs authorizing a deviation from the Partnership Model of Division. Additionally, we conclude that its deviation from partnership principles by waiving Nicoleta's $588,677 equalization payment did not constitute an abuse of discretion.

Noting that the Family Court determined that he was entitled to a Category 1 and 3 capital contribution credit of $505,766, Bennett argues that "[t]he amount of deviation employed by the [Family Court] effectively denied [Bennett] repayment of 100% of his Category 1 and 3 capital contribution credits contrary to controlling case law." As the supreme court has held:

> Under the Partnership Model, absent [VARCs], each partner is generally awarded his or her capital contribution, while the appreciation is split fifty-fifty. **VARCs permit the family court to equitably deviate from the Partnership Model in dividing the parties' Marital Partnership Property.**

23

Kakinami, 127 Hawai'i at 130 n.4, 276 P.3d at 699 n.4 (emphasis added; internal citation omitted). Thus, while general partnership principles dictate that, "assuming all [VARCs] are equal," Bennett would receive the entire value of his Category 1 and 3 capital contribution,[11] equitable deviations are permitted if sufficient VARCs exist.

> In determining whether one or more [VARCs] authorize the family court to deviate from the Partnership Model, the family "court shall take into consideration:  the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case." HRS § 580-47(a) (1993).  Other than relative circumstances of the parties when they entered into the marital partnership and possible exceptional situations, the above quoted part of HRS § 580-47(a) requires the family court to focus on the present and the future, not the past.

Jackson v. Jackson, 84 Hawai'i 319, 333, 933 P.2d 1353, 1367 (App. 1997) (quoting Epp v. Epp, 80 Hawai'i 79, 89, 905 P.2d 54, 64 (App. 1995)).

Here, the Family Court found that Bennett's Category 1 and 3 contribution credits totaled $505,766.  According to the Allocation Chart, Bennett was entitled to $2,027,403, and the total value of the marital assets allocated to him was only $1,438,726.  Nicoleta was entitled to only $1,537,037, but her allocation of marital assets was $2,125,714.  Thus, under marital partnership principles, absent VARCs, Bennett was entitled to an equalization payment of $588,677 from Nicoleta.  However, the Family Court also found in FOF 145 that "there are sufficient [VARCs] to deviate from marital partnership principles," based in part on FOFs 143 and 144:

---

[11]     See also Baker v. Bielski, 124 Hawai'i 455, 466-67, 248 P.3d 221, 232-33 (App. 2011) ("The NMVs in Category 1 represent the parties' capital contributions to the marital partnership.  Under general partnership law, each partner is entitled to be repaid his contributions to the partnership property, whether made by way of capital or advances.  **Category 1 . . . . NMVs are the partner's contributions to the Marital Partnership Property that, assuming all valid and relevant considerations are equal, are repaid to the contributing spouse[.]**") (citations and internal quotation marks omitted).

143. [Nicoleta] does not have the ability to work. Her future employment following her divorce is nil. Other than investing any award following her divorce, she will not be able to earn other types of income following her divorce. Although receiving spousal support for her life and child support, she will continue to have chronic medical issues and may well face increased medical expenses, including consultations out of state.

144. [Bennett] will continue to be self-sufficient. He is a skilled periodontist, who continues to work part-time despite his partial disability. He is also an inventor and an excellent investor. In addition, his tax free monthly disability payments will increase at least 5% each year according to the Cost of Living Rider in his Disability Income insurance policy.

The ICA analyzed similar findings in Schiller v. Schiller, 120 Hawai'i 283, 205 P.3d 548 (App. 2009). In that case, the husband argued that "the family court should have 'ordered [wife] to make an equalization payment of $589,437.11, which would leave each party with equal assets of $327,573.61[.]'" Id. at 308, 205 P.3d at 573 (some brackets in original and some added). The family court in Schiller found that the wife

ha[d] significant ongoing health problems, which include: borderline osteoporosis, severe osteoarthritis in her fingers with resulting pain, pain to her knee and shoulder areas, no vision in her left eye (she is fitted with an artificial eye), tearing in her right retina resulting in possible sudden blindness, and ha[d] been diagnosed and treated for squamous cell skin cancer. In addition, [wife] ha[d] been undergoing medical tests for gastrointestinal problems.

Id. at 295-96, 205 P.3d at 560-61. The family court also found that wife's "skin cancer significantly reduced her job opportunities in the real estate field due to an inability to be in the sun[,]" that her "age, lack of computer program knowledge, and the aforementioned health problems drastically limit[ed] her ability to work[,]" and that she "[did] not have a business network or resources in California in the field of real estate field [sic] and [did] not have any viable source of income other than her stock portfolio." Id. at 296, 205 P.3d at 561 (correction in original). The family court determined that these were VARCs authorizing a deviation from the Partnership Model,

and did not order the wife to make an equalization payment, essentially leaving the husband "with a negative net worth." Id. at 308, 205 P.3d at 573.

The ICA held that the family court "did not err in finding that [husband's] prospects for work were greater than [wife's]." Id. at 298, 205 P.3d at 563. The ICA also held that the family court did not err in finding that this and other VARCs authorized a deviation from the Partnership Model of Division, and that "the family court's extensive FOFs clearly show that in dividing and distributing [wife] and [husband's] assets and debts, the court took into consideration the conditions each would be in after their divorce." Id. at 308, 205 P.3d at 573.

Similarly, in the instant case, the Family Court's FOFs regarding Nicoleta's health problems and minimal employment prospects were not clearly erroneous, nor were they challenged on appeal. The Family Court's finding of sufficient VARCs is not clearly erroneous, and thus the Family Court did not abuse its discretion when it deviated from the marital partnership principles and waived Nicoleta's $588,677 equalization payment.

E.   The Temporary Support Orders

We reject Bennett's argument that the Family Court abused its discretion when it "erroneously extended [Nicoleta's] inflated temporary support orders for 19 months" between DOCOEPOT on November 27, 2009 and the final issuance of the Divorce Decree on July 5, 2011.[12]

Under HRS § 580-9 (2006), the court may award temporary spousal support "pending the complaint as the court may deem fair and reasonable." Under HRS § 580-11 (2006), it may award

---

[12]   The February 5, 2009 order for temporary relief required Bennett to pay a total of $7,470 per month to Nicoleta in temporary support ($1,970 for child support and $5,500 for spousal support). Under the Order and Divorce Decree, Bennett's total monthly permanent spousal and child support was decreased to $4,000 in spousal support and $2,069 for child support, thus totaling $6,069 per month.

pendente lite child support "[d]uring the pendency of any action for divorce."

> [W]hen the trial judge expressly reserves for future consideration the additional question of the amount of the permanent alimony . . . the order for temporary alimony may properly be continued in effect until the entry of final decree fixing the amount of the permanent alimony.

Ando v. Ando, 30 Haw. 80, 81 (Haw. 1927). Thus, the Family Court did not abuse its discretion by extending Nicoleta's temporary support award during the pendency of the case.

Furthermore,

> [a]n award of temporary support can be modified, for it is a provision for reasonable support of a person. As such, it is subject to adjustments prospectively when there is a showing of a change in circumstances, as the financial situations of the respective parties. However, indirect recovery in a final decision through recoupment is improper and inconsistent with the purposes of the award.

Farias v. Farias, 58 Haw. 227, 233, 566 P.2d 1104, 1108-09 (1977) (citations omitted). Bennett does not argue, nor does it appear from the record, that Bennett sought a modification of the temporary support in the Family Court, pending the entry of the Divorce Decree. Absent such relief, Bennett was not entitled to any restitution or recoupment in the Divorce Decree.

F. The 2008 Honda

Bennett does not dispute that he agreed to the pay off of Nicoleta's car loan with "existing marital assets prior to any division thereof." However, citing to FOF 141, Bennett argues that the Family Court did not properly account for the payoff of the car in its division of the parties' marital assets, when it valued the Honda at $2,488 on the Allocation Chart in FOF 141, rather than $24,300. We agree.

At trial, Nicoleta testified that she had identified the current market value of the 2008 Honda as $24,330. The $2,488 figure in FOF 141 is presumably the "equity" in the Honda before the loan was paid, as it can be calculated by subtracting the $21,842 in outstanding payments from its current value of $24,330 ($24,330 - $21,842 = $2,488). Nicoleta does not dispute

that the loan was to be paid using pre-division marital assets, as Bennett agreed and the Family Court ordered. Thus, the Family Court clearly erred when it failed to account for the full $24,330 value of the Honda awarded to Nicoleta; in addition, we reject Nicoleta's argument that the difference is so small that it is "irrelevant."

G. 2011 Property Tax Deductions

Bennett argues that the Family Court abused its discretion when, in the Divorce Decree, it both ordered that Nicoleta "shall be entitled to the deduction for the property tax payments made in tax year 2011[,]" and purportedly ordered Bennett to make the property tax payments, even beyond the effective date of the Divorce Decree (until the transfer of title of the property to Nicoleta). First, any post-decree payment could have been avoided by Bennett's prompt transfer of the home to Nicoleta, as she was made solely responsible for all post-transfer property taxes. In addition, Bennett does not contend or offer any evidence that he made any post-decree property tax payment. Finally, as noted by Nicoleta, for 2011, Bennett was allowed to claim both children as dependents and Nicoleta was allowed the tax deduction for the 2011 property taxes. We conclude that the Family Court did not abuse its discretion in this allocation of tax payments and deductions.

H. Life Insurance

Bennett argues that the Family Court abused its discretion when it ordered him to maintain a life insurance policy in the amount of $1.5 million, with Nicoleta as beneficiary, so long as he has an obligation to pay child support or alimony. In particular, Bennett challenges FOF 138:

> It would be just and equitable that [Bennett] maintain [his $1.5 million] life insurance policy in effect with [Nicoleta] being the exclusive primary beneficiary for so long as he has an obligation to pay child support or alimony. It would also be just and equitable that in the event [Bennett] dies without the required insurance, [Bennett's] estate shall be liable to [Nicoleta] to the extent that the required life insurance was not maintained.

28

Bennett notes that the purpose of the life insurance order is to secure his support obligations should he die, but argues that, pursuant to an unappealed term of the Divorce Decree, his spousal support obligation to Nicoleta terminates upon his death. He further notes that his children are in their teens, presumably referencing that his support obligations end at the latest upon their reaching age twenty-three (and possibly earlier), and that $1.5 million is far in excess of an amount reasonably necessary to secure his obligation for their support. He also argues, in the event of his death without such insurance, his estate should only be liable for the actual amount of any outstanding support obligation, not the full amount of $1.5 million. Nicoleta acknowledges that the life insurance order was intended to secure Bennett's support obligations, but argues that the Family Court did not abuse its discretion in ordering it.

HRS § 580-13 (2006) provides:

> **§ 580-13 Security and enforcement of maintenance and alimony.** Whenever the court makes an order or decree requiring a spouse to provide for the care, maintenance, and education of children, or for an allowance to the other spouse, the court may require the person subject to such order or decree to give reasonable security for such maintenance and allowance. Upon neglect or refusal to give the security, or upon default of the person subject to such order or decree and such person's surety to provide the maintenance and allowance, the court may sequester such person's personal estate, and the rents and profits of such person's real estate, and may appoint a receiver thereof and cause such person's personal estate and the rents and profits of such person's real estate to be applied towards such maintenance and allowance, as to the court shall from time to time seem just and reasonable.

Thus, as acknowledged by Bennett and Nicoleta, Hawai‘i law grants the Family Court the discretion "to give reasonable security" for child support and alimony, which we construe to permit a requirement of life insurance reasonably calculated to secure those obligations.

However, as the Divorce Decree provides that Bennett's alimony obligation terminates, at the latest, upon his death, the Family Court abused its discretion in ordering life insurance

calculated to secure any alimony obligation that has not accrued on or before the date of his death. Similarly, it was an abuse of discretion to deem his estate liable, on account of spousal support, for an amount that would appear to far exceed spousal support payments reasonably likely to be accrued at the time of his death. If, for example, Bennett owed one month of spousal support ($4,000, plus Nicoleta's medical insurance premium) at the time of his death, a $1.5 million payment would be patently excessive.

In addition, although the portion of the life insurance obligation ordered to secure the payment of Bennett's support obligation to his children was not separately identified, it appears that $1.5 million far exceeds the amount necessary "to give reasonable security" for the remaining amount of the two children's period of dependency including, inter alia, undergraduate tuition at the University of Hawaiʻi or an equivalent, in-state, resident institution, as provided in the Divorce Decree.[13] Accordingly, we vacate the life insurance order. On remand, the Family Court may consider insurance or other means that would provide reasonable security for the support obligations ordered by the Family Court.

I.    Post-Decree Order re Nicoleta's Medical Insurance

Bennett argues that the Family Court erred, in various ways, when it granted Nicoleta's post-decree motion to enforce the Divorce Decree with respect to Nicoleta's medical insurance premiums. The Divorce Decree provides, inter alia: "Husband shall pay Wife's healthcare premiums for the Kaiser HIPPA Platinum Plan ($290 per month at DOCEPOT), or reasonable equivalent if it is not available, and any increases in premiums,

---

[13]    As both children are currently at or near the age of majority, upon remand, the Family Court may also consider whether Nicoleta should remain as the exclusive primary beneficiary of any required life insurance or other security.

if any, in the ensuing years."  Bennett does not challenge this provision in his appeal from the Divorce Decree.

In the Post-Decree Enforcement Order, the Family Court found, inter alia:

> 16.  The Kaiser HIPPA Platinum Plan is no longer available or offered by Kaiser Permanente.
> 17.  The Kaiser HIPPA Plan 20/RX (as opposed to the Kaiser HIPPA Plan 30/RX) is a reasonable equivalent to the Kaiser HIPPA Platinum Plan.  It costs [Nicoleta] $429.13/month for the Kaiser HIPPA Plan 20/RX.
> 18.  [Bennett] has paid [Nicoleta] $290/month for her healthcare premiums.
> 19.  [Bennett] shall pay [Nicoleta] the sum of $695.65 ($139.13/month for 5 months, July through November, 2011), the difference in what [Bennett] paid [Nicoleta] for healthcare insurance and the actual cost to [Nicoleta] of the HIPPA Plan 20/RX for these 5 months.
> 20.  [Bennett] shall pay [Nicoleta's] healthcare premiums for the Kaiser HIPPA Plan 20/RX, in the present amount of $429.13/month, pursuant to paragraph 4 of the Decree.

First, Bennett argues that the Family Court lacked jurisdiction to enter the Post-Decree Enforcement Order.  As the supreme court has held:

> [O]nce a party files a notice of appeal, the lower court is generally divested of jurisdiction to proceed further on the matter. . . . [H]owever, the family court retains jurisdiction to enforce its own judgments and decrees.  Accordingly, the issue presented before this court is whether the post-decree order enforced the family court's prior order, which would be permissible, or modified the family court's prior order, which would be impermissible.

Kakinami, 127 Hawai'i at 143, 276 P.3d at 712 (citations omitted).  Here, the Family Court had jurisdiction because Nicoleta's post-decree motion sought enforcement rather than modification of the Divorce Decree.  The Family Court had previously awarded Nicoleta her medical insurance premiums or a "reasonable equivalent."  The Family Court did not err in concluding that the Post-Decree Enforcement Order "merely enforced an obligation that had been previously set forth in the [Divorce Decree]," even though the amount Bennett was ordered to pay was different than the amount referenced in the Divorce Decree.  See Kakinami, 127 Hawai'i at 144, 276 P.3d at 713.  The Divorce Decree specifically provided for the possibility that the

actual healthcare premiums would vary from the $290 amount that was referenced.

Next, Bennett argues that Kaiser HIPPA Plan 20/RX is not the "reasonable equivalent" of the $290 Kaiser Platinum Plan. Bennett does not, however, challenge the Family Court's finding that the Kaiser Platinum Plan is no longer available. Nor does Bennett point to evidence of an alternative that he considered to be a "reasonable equivalent." On the record of this case, we conclude that the Family Court did not clearly err in finding that the Kaiser HIPPA Plan 20/RX is the "reasonable equivalent" of the Kaiser Platinum Plan and, therefore, the Family Court did not err in granting Nicoleta's post-decree relief on this issue.

Finally, Bennett argues that the Family Court erred when it failed to adjust its original child support calculations in light of the order that required him to pay a higher health insurance premium for Nicoleta. Bennett did not file a motion seeking to amend the child support award and cites no authority requiring the court to, *sua sponte,* reduce child support on account of the Post-Decree Enforcement Order. This argument is without merit.

J.    Direct Child Support Order

The Divorce Decree provides that Bennett must directly pay Nicoleta $2,069 per month for child support rather than pay through the Child Support Enforcement Agency (**CSEA**). Although the parties initially agreed to direct payment, the Divorce Decree failed to comply with HRS § 576D-10(f) (Supp. 2013) because it did not "provide that either parent may void the arrangement at any time and apply for services from the [CSEA] to act as agent to receive payments from the obligor parent."[14]

---

[14]    HRS § 576D-10(e) (Supp. 2013) provides, in relevant part:

(e)    The court may approve an alternative arrangement for the direct payment of child support where []:
(1)    The obligor or custodial parent demonstrates and the court finds that there is good cause not to
(continued...)

Bennett "had the right to void the direct payment arrangement at any time and apply to CSEA to collect and disburse payments." Doe v. Doe, 118 Hawai'i 268, 280, 188 P.3d 782, 794 (App. 2008). Thus, the Family Court erred by ordering direct child support payment to Nicoleta without providing that either party may void the arrangement.

K.    The Children's Medical Insurance Premiums

Bennett argues that the Family Court abused its discretion when it ordered him to "maintain existing levels" of healthcare insurance for the children, in light of the fact that he is solely responsible for the payment of all of the children's uncovered medical and dental insurance expenses.  The Family Court has "wide discretion in making its decisions," which will not be disturbed unless there is a "manifest abuse of discretion."  Fisher, 111 Hawai'i at 46, 137 P.3d at 360 (citation omitted).  Ordering Bennett to maintain the children's existing level of healthcare coverage was not a manifest abuse of discretion.

L.    Tax Consequences of Property Division

Bennett argues that the Family Court abused its discretion when it included the italicized part of the following provision in the Divorce Decree:

> **Tax Consequences of Property Division**.  *The parties assume and intend that the division of property incident to their divorce shall not itself result in any tax consequences,* that each party will take each property interest awarded to him or her at its pre-divorce basis, and that any tax which must be paid upon the subsequent sale or exchange or any such interest shall be paid by the party who received and

---

14 (...continued)
require immediate withholding; or
(2)    A written agreement is reached between the obligor and the custodial parent and signed by both parties[.]

HRS § 576D-10(f) further provides, in relevant part:

(f)    Any alternative arrangement for direct payment shall provide that either parent may void the arrangement at any time and apply for services from the agency to act as agent to receive payments from the obligor parent.

> subsequently sold or exchanged such interest. *If the actual tax consequences of the division of property are different than assumed, a party who received an unintended benefit shall make payment to the other party as and for property division in an amount necessary to, inasmuch as possible, place the parties in the same relative position they would have enjoyed had there been no unexpected tax consequence.* To the extent that a party possesses information necessary to establish the basis in property awarded to the other party, he or she shall provide that information to the other party.

(Italics added.)

Bennett argues that he never "assumed and intended" or otherwise agreed to any particular tax consequences and, in fact, there clearly would be tax consequences associated with the "cashing in" and dividing of investment assets. This language appeared for the first time in Nicoleta's submitted form of the Divorce Decree and she points to nothing in the record supporting such an assumption, intention, or agreement. Indeed, absent an agreement to such a term, we find no statutory or legal grounds for its inclusion and Nicoleta cites none. Cf. Bienvenue v. Bienvenue, 102 Hawai'i 59, 69-70, 72 P.3d 531, 541-42 (App. 2003); Nakata v. Nakata, 3 Haw. App. 51, 56, 641 P.2d 333, 336 (1982) (if the family court decides to change an agreed-upon term before incorporating it into the decree, both parties must consent or the issue must be treated as contested).[15] Moreover, this provision is inherently vague and ambiguous, providing no baseline of "assumed" tax consequences or benchmark for measuring whether, when, and to what extent an adjustment should be made, rendering it problematically ripe for disputes. For these reasons, we conclude the Family Court plainly erred when it

---

[15] Moreover, this provision could be construed as applying to tax consequences arising long after the parties' divorce and property division. The inclusion of such a provision undermines the overarching goal of achieving a final property division, potentially exposing the parties to claims years after the divorce that they must, in effect, make adjustments to their property division for taxes owed by their ex-spouse. In addition, a party who is awarded a particular asset has sole control over a later disposition of that asset, and thus the resulting taxable gains or losses, which are also impacted by that party's overall tax situation, planning, decisions, and intervening changes in tax laws.

included the italicized language, which should be stricken upon the remand of this case.

M.    Checking and Savings Accounts

Bennett contends, and Nicoleta apparently acknowledges,[16] that the Family Court improperly failed to account for the parties' respective checking and savings accounts as part of the final property equalization calculation. Although the Family Court did not abuse its discretion when it ordered that the parties would each keep their own separate accounts, the value of these accounts must nevertheless be taken into consideration and the Family Court erred in failing to include these accounts in its final calculations.

N.    Child Custody Issues

Bennett objects to certain language in the Divorce Decree provision concerning the physical custody of the children. First, Bennett objects to the following: "Neither party shall engage in any inappropriate or sexually related conduct, talk, conversations, or activities in the presence or hearing of the children." He argues that it impinges on his right to have entirely appropriate conversations with his teenage children related to sexual activity, health, and birth control, for example. We agree. Absent extraordinary and/or otherwise compelling circumstances, the Family Court is not authorized to encroach upon, interfere with, and/or micro-manage parental decision-making. See Bencomo v. Bencomo, 112 Hawai'i 511, 516-17, 147 P.3d 67, 72-73 (App. 2006); see also, e.g., State, Child Support Enforcement Agency v. Roe, No. 28595, 2008 WL 46484353 (App. Oct. 24, 2008); cf. Carr v. Buenger, No. CAAP-11-0000545, 2014 WL 2440185 (App. May 30, 2014) (extraordinarily high level of conflict between parents, notwithstanding extensive services

---

[16]    Nicoleta essentially argues that any error is irrelevant because the Family Court waived her equalization payment.

and interim measures, supported the establishment of a detailed parenting plan).

Bennett also objects to "orders at pages 3-7 of the Decree" that concern "child custody and visitation" and "contain numerous additional non-standard orders including language regarding the right of first refusal." In light of the fact that the children have reached or will soon reach the age of majority, and thus may decide for themselves whether they want to spend a particular holiday with either or neither of their parents, for example, we need not address the Family Court's order with respect to holiday visitations and other visitation and parenting-related provisions.

O.    Children's Extracurricular Activities

Bennett argues that the Family Court erred when it ordered that he be solely responsible for "the costs incurred in connection with the children's extracurricular activities" because this was neither agreed to or litigated and because Nicoleta's claim of responsibility for some of these expenses was part of the court's consideration of spousal and child support. In response, Nicoleta simply argues that Bennett agreed to this arrangement in the Pre-Trial Stipulation. However, it is clear from the language of the Pre-Trial Stipulation that it was intended to be a temporary agreement to minimize the impact of potential disputes on the children, pending resolution of the divorce. It is unclear what "extracurricular activities" are intended to be included in this provision and there is no explanation as to why such activities are not adequately supported by child support or within the parents' discretion to fund out of their other resources. Under these circumstances, we conclude that the Family Court abused its discretion in requiring such additional support payments.

P.    Post-Judgment Interest

Bennett argues that the Family Court erred when, in the Post-Decree Enforcement Order, it ordered Bennett to pay Nicoleta

statutory interest of 10% per annum on the sum of $594,805 from July 5, 2011, the date the Divorce Decree was entered, through October 5, 2011, the date of payment.

HRS § 478-3 provides: "Interest at the rate of ten per cent a year, and no more, shall be allowed on any judgment recovered before any court in the State, in any civil suit." Post-judgment interest runs from the date the judgment was entered. See Richards v. Kailua Auto Mach. Serv., 10 Haw. App. 613, 624, 880 P.2d 1233, 1239 (1994) ("While no award for post judgment interest was made, interest from the date judgment was entered in the district court should be granted").

Bennett's argument that no judgment was entered is without merit, because the Divorce Decree, which awarded Nicoleta one-half of the parties' Accounts Assets, was a judgment entitling her to payment on account of the judgment. See, e.g., Doe v. Doe, 99 Hawaiʻi 1, 7, 52 P.3d 255, 261 (2002) (holding that "the Divorce Decree is not a mere 'agreement;' the Decree constitutes a final judgment of the family court.") (emphasis in original); Pratt v. Pratt, 104 Hawaiʻi 37, 40, 84 P.3d 545, 548 (App. 2004) ("The Divorce Decree constituted a final judgment."); 27A C.J.S. Divorce § 448 (2014) ("A divorce decree is a judgment, and is not distinguishable from judgments rendered in actions other than divorce actions, in the absence of statutory provisions creating such a distinction.") (footnote omitted); see also Doe v. Doe, 97 Hawaiʻi 160, 162-63, 34 P.3d 1059, 1061-62 (App. 2001) (ex-wife entitled to post-judgment interest on child support arrearage pursuant to HRS § 478-3).[17]

---

[17] On remand, however, the amount of interest due may be recalculated when the Family Court adjusts its final calculations to properly account for the parties' respective checking and savings accounts, as discussed in Section IV.M. above.

Q.      The Co-Habitation Clause

Nicoleta argues that the Family Court abused its discretion when it ordered that her permanent alimony and medical insurance payments shall terminate upon her cohabitation.[18]

While HRS § 580-51 (2006) provides for the automatic termination of spousal support upon the supported party's remarriage,[19] this provision does not apply to cohabitation.[20] However, this court has recognized that a family court has the authority to include such a provision in a Divorce Decree when it held that "the [spousal support] recipient's cohabitation is not relevant to the payor's duty to pay spousal support <u>unless the decree specifically makes it relevant by authorizing or requiring a reduction or termination</u> of spousal support upon the recipient's cohabitation." Amii v. Amii, 5 Haw. App. 385, 392, 695 P.2d 1194, 1199 (1985) (emphasis added).

---

[18]     FOF 123 provides:  "It would be just and equitable that spousal support shall terminate upon the death of either party or upon the remarriage or cohabitation of [Nicoleta]."  On June 2, 2011, the Family Court denied her request to remove cohabitation as a basis for termination of her alimony. The Divorce Decree similarly provides that alimony shall terminate upon Bennett's or Nicoleta's death, Nicoleta's remarriage, or her cohabitation.

[19]     HRS § 580-51(a) provides:

> Upon the remarriage of a party in whose favor a final decree or order for support and maintenance has been made, all rights to receive and all duties to make payments for support and maintenance shall automatically terminate for all payments due after the date of the remarriage, unless the final decree or order, or an agreement of the parties approved by the final decree or order, provides specifically for the payments to continue after such remarriage.

[20]     In contrast, California statutes specifically mandate such a presumption:

> Except as otherwise agreed to by the parties in writing, there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner.

Cal. Fam. Code § 4323(a)(1) (West 2014), <u>amended by</u> 2014 Cal. Legis. Serv. Ch. 82 (S.B. 1306) (West).

Nicoleta argues that the Family Court abused its discretion in this regard because Amii held that cohabitation was not relevant in considering a request to modify the payor's duty to pay spousal support. Nicoleta acknowledges the Amii court's reservation in the case where a decree specifically authorized a reduction or termination upon cohabitation, but argues that it should be disregarded. Nicoleta also correctly notes distinctions between a lawful marriage and co-habitation. However, her argument that a future court might mistake an overnight guest for a cohabitation partner is without factual or legal support. Moreover, Nicoleta fails to acknowledge that HRS § 580-47(a) grants the Family Court wide discretion in authorizing spousal support for a limited period of time or an indefinite period of time. In addition, Nicoleta argues that the burden should be placed on Bennett, at the time of her co-habitation, to prove that co-habitation constitutes a material change in relevant circumstances. However, as evidenced by cases cited by both parties, absent a provision in the Divorce Decree authorizing reduction or termination of support, cohabitation will not be considered a material change in circumstances.

Nicoleta suffers from a variety of health conditions that limit her ability to work, which informed the Family Court's award of spousal support. However, Nicoleta was also awarded the unmortaged family home and a considerable amount of investment assets that will, presumably, continue to produce income. Cohabitation, while not illegal or immoral or necessarily providing the legal consequences of marriage itself,[21] generally provides an economic benefit to the cohabitators, as statutorily

---

[21] Although, as held to Nicoleta's benefit in this case, as well as others, cohabitation, when combined with a sharing of financial resources and individual energies and efforts, may provide evidence of a pre-marital economic partnership.

recognized in California and other states.[22]  In Amii, the ICA
recognized that cohabitation may warrant a reduction or
termination of alimony, if it provides an economic benefit, when
the court stated that "[t]he effect of a cohabitation situation
on the recipient's continuing need for spousal support is
relevant" to the payor's duty to pay spousal support.  Amii, 5
Haw. App. at 392-93, 695 P.2d at 1199.  Other states have adopted
this economic benefit analysis as well.  See, e.g., Gayet v.
Gayet, 456 A.2d 102, 104 (N.J. 1983) (adopting a flexible
approach that examines the economic realities rather than the
status of cohabitation); Dibartolomeo v. Dibartolomeo, 679 So.2d
72, 73 (Fla. App. 1996) ("To justify a post judgment
modification, the focus should not be so much on the cohabitation
as on how the living situation has impacted the former spouse's
financial condition and need for continued support."); Stevens v.
Stevens, 492 N.E.2d 131, 136 (Ohio 1986) (cohabitation is
properly considered only "insofar as it is relevant to the issues
of continued need for such alimony and the amount") (citation and
internal quotation marks omitted).

Bennett argues that the Family Court's order simply
follows the procedure set out in a number of other states, where
it is the payor's burden to make a prima facie showing of
cohabitation and then the burden is shifted to the payee to show
no economic benefit.  However, the Divorce Decree provides for no
such procedure, it merely terminates both spousal support and
healthcare coverage, in their entirety, upon Nicoleta's
cohabitation.  Indeed, it would appear to preclude consideration
of Nicoleta's continued need for support, notwithstanding
cohabitation, in conjunction with a motion by Nicoleta filed

---

[22]    See, e.g., Cal. Fam. Code § 4323(a)(1); Conn. Gen. Stat. Ann.
§ 46b-86(b) (West 2013); Fla. Stat. Ann. § 61.14(b) (West 2010); N.J. Stat.
Ann. § 2A:34-23(n) (West 2014).  Other state statutes, unlike HRS § 580-51(a),
specifically provide for termination of alimony upon cohabitation.  See, e.g.,
Ala. Code 1975 § 30-2-55 (West 1981); N.C. Gen. Stat. Ann. § 50-16.9(b) (West
1995); 23 Pa. Cons. Stat. Ann. § 3706 (West 1990); Utah Code Ann. § 30-3-5(10)
(West 2013).

under HRS § 580-47(d). Thus, absent a modification to the support termination provision, which might, for example, allow Nicoleta to demonstrate her continued need for the full or merely a reduced amount of spousal support, we conclude that the Family Court abused its discretion in ordering the complete termination of spousal support and healthcare insurance upon Nicoleta's cohabitation. Upon remand, the Family Court may consider whether a more flexible termination or reduction provision related to cohabitation might be warranted under the circumstances of this case.

R.    The Child Support Calculations

Nicoleta argues that the Family Court erred by failing to:  (1) adjust Bennett's tax-free disability payments before inserting them as part of Bennett's Monthly Gross Income in the CSG worksheet; and (2) order automatic annual increases in child support to reflect the annual minimum five percent increases in Bennett's disability payments.

With respect to Nicoleta's first point, we first consider HRS § 576D-7(a), which provides for the establishment of child support guidelines, the CSG, that may consider, among other things, "[a]ll earnings, income, and resources of both parents; provided that earnings be the net amount, after deductions for taxes, and social security." HRS § 576D-7(a)(1). HRS § 576D-7(b) requires statewide application of the CSG, simplification of calculations to the extent practicable, and the consideration of the guidelines by the family court judges in the establishment of each child support order. Generally, this "net amount" of income referenced in HRS § 576D-7(a)(1), or Monthly Net Income, is determined by inserting a parent's Monthly Gross Income into the CSG Worksheet, which then automatically makes an adjustment for a presumed rate of taxes. See 2010 Hawai'i Child Support Guidelines and Worksheets. Thusly, the CSG-Worksheet-formulated adjustments satisfy the goals of making the calculations more easily reproducible (thus increasing uniformity of application),

more user-friendly for both the parties and the courts, and generally accurate, but they do not attempt to account for each of the myriad of ways the calculated Monthly Net Income might differ from a person's actual (monthly) net taxable income due to the countless permutations of exceptions, deductions, credits, and other factors that might affect a person's actual net taxable income under state and federal tax laws.

Here, it is undisputed that a substantial portion of Bennett's Monthly Gross Income consists of a monthly disability payment that is not subject to FICA, state income taxation, or federal income taxation. Thus, Nicoleta argues, the Family Court should have increased the gross amount of Bennett's income to adjust for this fact. At first blush, this tax-free income makes the use of the CSG Worksheet appear to be problematic, because the Worksheet formulaically reduces Monthly Gross Income by certain percentages according to income brackets to arrive at a CSG Monthly Net Income, rendering the calculated amount of Bennett's Monthly Net Income significantly lower than the tax-free income that, in fact, remains at Bennett's disposal. However, there is no basis in the CSG for artificially increasing Bennett's Monthly Gross Income, and doing so would make the resulting "adjusted" Monthly Gross Income factually inaccurate. The *only* relief requested by Nicoleta was to adjust Bennett's Monthly Gross Income upward, which the Family Court ultimately declined to do. The Family Court did not err in failing to grant this relief.

We, nevertheless, examine this issue further, both to further explain our reasoning and because the child support order remains subject to the jurisdiction of the Family Court and subject to modification pursuant HRS § 576D-7(d) and (e). As noted, the CSG are implemented in most cases through the use of an automated Worksheet, but the CSG also provide step-by-step instructions to complete the Worksheet manually. See 2010 Hawaiʻi Child Support Guidelines, § II.A. For a parent with

income up to $13,000, a Table of Incomes is provided to convert Monthly Gross Income to Monthly Net Income.  See id., Appendix D. More relevant to this case, for individuals with income over $13,000, §§ III.E. and III.F. of the CSG provide detailed steps and formulas for the calculation of the Monthly Net Income.  See id., §§ III.E. and III.F.[23]  CSG § III.E. provides, in relevant part:

> 2.      For individuals employed by others with income over $13,000 per month.
>
> NET INCOME FOR GUIDELINES PURPOSES is determined by:
>
> a.      Adding the gross monthly income from all sources (see IV.H.1. [sic][24]).
>
> b.      Subtracting all three taxes:
> (i)  [FICA]          $681 plus 1.45% (.0145) times income over $8,900
>
> (ii)  [STATE TAX]    $268 plus 8.25% (.0825) times income over $4,000
> (iii)  [FED. TAX]    for incomes up to but not over $14,295: $1,395 plus 28% (.28) times income over $6,854
> for incomes over $14,295 but not over $31,079:  $3,480 plus 33% (.33) times income over $14,295
> for incomes over $31,079: $9,018 plus 35% (.35) times income over $31,079

---

[23]     CSG § III.E. sets forth the steps and formula for individuals employed by others with income over $13,000, and CSG § III.F. sets forth the steps and formula for self-employed individuals, including those with income greater than $13,000.  For the purposes of simplicity and brevity, we discuss the former, although the latter may well apply to Bennett, if his gross income is adjusted for (certain) business expenses and self-employment taxes.  Our analysis using III.E. is not intended to foreclose the application of III.F. in this case, if it is determined that III.F. is applicable to part of Bennett's income.  In addition, as there is no dispute, we need not address other applicable CSG provisions, such as the "Exceptional Circumstances" provisions which allow the deduction of other payments for the children or other parent, such as Bennett's payments to Nicoleta.  See 2010 Hawai'i Child Suppport Guidelines § II.B.2.

[24]     This reference should be to § IV.I.1.

3.    Subtracting $791 (after-tax poverty level self support in Hawaiʻi).

FORMULA
GROSS INCOME PER MONTH    $ _____
FICA                      − _____
[STATE] TAX               − _____
FEDERAL TAX               − _____
SELF-SUPPORT              −   $791
       **NET INCOME**
       **FOR WORKSHEETS**     $ _____

4.    SOLA INCOME is Gross Income Per Month Less $1,038.

2010 Hawaiʻi Child Support Guidelines, § III.E.

CSG § III.E. is illuminating, as it lays out the calculations built into the automated CSG Worksheet. In addition, it cross-references CSG § IV.I.1., for the determination of gross monthly income. CSG § IV.I.1., specifically includes disability insurance benefits as part of Gross Income, as well as other types of income that might be subject to lower tax rates at either the state or federal level, such as social security benefits or investment income, or no state taxes (in Hawaiʻi), such as pension income. See 2010 Hawaiʻi Child Support Guidelines, §§ IV.I.1.e., h., & l. Section IV.I.3. of the CSG, concerning Net Income, expressly notes that resulting variances are to be expected:

> Net income is **not** take-home pay. Net income is not actual disposable net income. The taxes used in this calculation are not necessarily the actual taxes paid by the parent.

2010 Hawaiʻi Child Support Guidelines, § IV.I.3.

Thus, we conclude that the Family Court was simply complying with the directives of the CSG, as the court is required to do, when it included Bennett's "unadjusted" disability pay as part of Bennett's Monthly Gross Income.

We also reject Nicoleta's argument that the Family Court erred when it refused to make "automatic" annual increases to the child support because Bennett's disability payments increased annually. This argument is without legal support and is inconsistent with HRS §§ 576D-7(d)&(e), which identify the

circumstances, timing, and procedure for seeking an increase (or decrease) to the child support obligation.

      S.    Disability Payments - Assets or Income

      Nicoleta argues that the Family Court should have deemed Bennett's future disability payments as Category 5 marital assets under HRS § 580-47(a) and awarded her half of those "assets" in the division of the parties' property.

> [D]isability pay is an entitlement that is generated when the recipient becomes disabled during the recipient's employment and, to the extent of his disability, cannot work. Like disability compensation under workers' compensation laws, military disability pay is paid in lieu of and is akin to income that is earned and received post-employment. Like other income that is earned and received post-divorce, disability pay is not property divisible in a divorce case.

Perez v. Perez, 107 Hawai'i 85, 89, 110 P.3d 409, 413 (App. 2005); see also Jones v. Jones, 7 Haw. App. 496, 499, 780 P.2d 581, 584 (1989). Although both Perez and Jones involved military disability pay, neither case limited its holding or distinguished between military and other types of disability pay that are paid in lieu of and are akin to income. See id.

      The rule articulated in Perez and Jones relating to nondivisibility of disability pay in divorce cases applies to Bennett's future disability benefits. These monthly benefits, which will continue until he reaches sixty-five years of age, replace income lost due to his injury, and thus constitute post-divorce earned "income." Nicoleta did not show that Bennett's disability benefits include a pension or retirement component. Accordingly, they do not constitute a marital asset subject to division and distribution under HRS § 580-47(a), and Nicoleta is not entitled to one-half of Bennett's future disability income.[25]

---

[25]    The Family Court considered Bennett's future monthly disability benefits as part of his monthly income when it calculated Nicoleta's permanent alimony award, as well as his child support payments.

V.    CONCLUSION

For the reasons and to the extent set forth herein, the Family Court's July 5, 2011 Divorce Decree is affirmed in part and vacated in part.  This case is remanded to the Family Court for further proceeding consistent with this Opinion.

On the briefs:

Michael S. Zola
for Defendant-Appellant/
Cross-Appellee

Peter Van Name Esser
     and
Ira Leitel
for Plaintiff-Appellee/
Cross-Appellant